## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------X

OBRIAN PASTRANA,

Plaintiff,

-against-                                              **VERIFIED COMPLAINT**

NEW YORK CITY FIRE DEPARTMENT, NEW                     1:24-cv-07348
YORK CITY DEPARTMENT OF HEALTH
AND MENTAL HYGIENE, and the CITY OF
NEW YORK,

Defendants.                 **JURY TRIAL DEMANDED**

--------------------------------X

Plaintiff, OBRIAN PASTRANA, through Counsel, states for his Verified Complaint as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff O'Brian Pastrana's journey as a firefighter is a testament to his unwavering commitment to the city he swore to protect. At the tender age of twenty, he embarked on a career with the New York City Fire Department ("FDNY") as an Emergency Medical Technician in 2006. In 2013, he ascended to the role of a firefighter, ready to face the inherent dangers of his vocation with courage and dedication. Little did he know that the ultimate test of his heroism would come during the COVID-19 pandemic, a time when New York City cried out for its brave first responders to stand tall.

2.      While most of the City sought shelter from the storm, Firefighter Pastrana and his fellow first responders bravely plunged into the maelstrom of uncertainty, providing essential services to a grateful city. They were hailed as heroes by New York's residents, the media, and the government for their selfless commitment to safety. For Firefighter Pastrana, risking his life

1

to ensure the well-being of New Yorkers was second nature, and he never hesitated to report for duty.

3.       In October 2021, when the FDNY and the City mandated that he receive the COVID-19 vaccine as a temporary condition of employment, Firefighter Pastrana did not waver in his duty. He rolled up his sleeve and received the jab, as required, because that is what heroes do – they put the welfare of others above their own. Tragically, it was in the line of this civic duty that he was injured by the COVID-19 vaccine.

4.       At the young age of thirty-five, Firefighter Pastrana's lifelong dream of serving the FDNY has been cruelly torn away from him, replaced by a future plagued by permanent disability and financial instability. Despite an immediate severe anaphylactic allergic reaction to the first dose of the COVID-19 vaccine, which was documented as a service-connected injury by the FDNY doctors, the FDNY required Mr. Pastrana to receive the second dose. After the second dose, Mr. Pastrana went into heart failure and was diagnosed with myocarditis, a rare but known adverse reaction to the Pfizer COVID-19 vaccine. His heart will never be the same, and the FDNY ultimately deemed him unfit for duty, ending his career as a firefighter in the cruelest of ways. This shocking turn of events stands as a haunting testament to the price Firefighter Pastrana paid for his unwavering dedication to his duties.

5.       Everyone – from the City to the FDNY to the New York City Fire Pension Fund– concurs on one undeniable fact: Firefighter Pastrana is permanently disabled from the COVID-19 vaccine. However, in a display of glaring injustice, the Fire Pension Fund – in a tie vote – denied him Accidental Disability Retirement benefits, leaving him without the necessary financial support after losing his career. Firefighter Pastrana brought an Article 78 proceeding challenging the denial of Accidental Disability Retirement benefits, which was denied by the

New York County Supreme Court, finding that although Firefighter Pastrana "was found to be

permanently disabled", his vaccine injury did not meet the legal qualifications for Accidental

Disability Retirement:

> Here, getting the vaccine was not an unexpected event – it was not an accident. Plaintiff knew he was getting the vaccine and was complying with the vaccine mandate. Unfortunately, he experienced incidental consequences from that expected vaccine. Of course, the bad consequences he suffered led to him receiving ODR. But this Court is unable to find that Plaintiff's physical ailments were the result of an accident as defined under the relevant caselaw. As noted above, an accident for purposes of awarding ADR arises where a firefighter suffers injuries from a sudden event rather than from adverse consequences from a planned event.

Pastrana v. New York City Fire Pension Fund, et. al., Index No. 160515/2023 (Sup Ct., New
York Cnty, April 3, 2023).

6.      Now, this Court stands as the last bastion of hope, with the power to provide

justice for this dedicated firefighter who sacrificed his health, career, and dreams to serve the

people of New York City. Firefighter Pastrana brings this action for the violation of his

constitutionally protected rights of personal autonomy, self-determination bodily integrity, and

the right to reject medical treatment, and for disability discrimination and the failure to

accommodate his medical condition – a condition caused by the very institution he bravely

served. The FDNY knew that Firefighter Pastrana suffered an anaphylactic reaction to the first

dose of the COVID-19 vaccine. He was taken by ambulance from the firehouse while on active

duty due to the worsening and severity of his allergic reaction, which included rash, hives, and

swelling in the lips. He was seen in the emergency room and was given epinephrine, a drug

commonly used to treat anaphylaxis, along with prednisone. He was seen repeatedly by FDNY

Bureau of Health Services doctors, and at each appointment, Firefighter Pastrana articulated the

fact that he was suffering from an ongoing severe allergic reaction to the COVID-19 vaccine and

that he was concerned about getting a second dose. A "severe allergic reaction" after a previous

3

dose of the COVID-19 vaccination or an "immediate allergic reaction of any severity" to a previous dose is the *only* CDC-delineated contraindication to any future doses of the vaccine. Despite his ongoing severe allergic reaction to the first dose, the FDNY not only recommended, but *required*, Firefighter Pastrana to receive the second dose of the COVID-19 vaccine.

7.     This case invokes fundamental principles of personal liberty and constitutional protection. The Due Process Clause of the Fourteenth Amendment guarantees the right to bodily integrity, the right to make personal medical decisions, and the right to refuse unwanted medical treatment, all of which are deeply rooted in this Nation's history and traditions.

8.     First, the City's Vaccine Mandate, as applied to all City employees, violated his fundamental right to bodily integrity and the right to refuse unwanted medical treatment. The COVID-19 vaccine, particularly as it was redefined by the CDC, did not function as a traditional vaccine that confers immunity but rather as a medical treatment designed to alleviate symptoms in those who contracted the virus. This distinction is critical, as the mandate required all employees, including healthy individuals like Firefighter Pastrana, to submit to a medical treatment that carried a known risk of injury, as demonstrated by Plaintiff's severe adverse reactions. The right to reject such medical treatment, especially one that does not provide immunity and poses significant risks, is a deeply rooted constitutional liberty protected by substantive due process.

9.     Second, the City's Vaccine Mandate became especially egregious in Firefighter Pastrana's case because he suffered a documented severe allergic reaction to the first dose of the vaccine, which the CDC recognized as a contraindication to receiving further doses. Despite this, the Defendants coerced him into receiving the second dose, disregarding both his medical condition and his constitutional right to refuse medically contraindicated treatment. This forced

medical intervention, under threat of termination, directly violated his right to personal autonomy and bodily integrity, further compounding the constitutional harm. The Defendants' failure to provide reasonable accommodations in the face of a known medical contraindication only underscores the arbitrariness of their actions and the severity of the constitutional violation.

10.     The Defendants callously disregarded Firefighter Pastrana's health and safety, and their obligations under the United States Constitution, New York City Human Rights Law ("NYCHRL") and New York State Human Rights Law ("NYSHRL") to provide a reasonable accommodation to the City's COVID-19 Vaccine Mandate. The FDNY was required by law to make reasonable accommodations to meet the needs of Firefighter Pastrana's medical impairments. They failed to do so, and that failure not only robbed him of his cherished career as an FDNY firefighter but also inflicted irreparable harm upon his health. This failure, this betrayal of trust and responsibility, serves as a damning indictment of an institution entrusted with safeguarding its own. Firefighter Pastrana's sacrifice should have been met with compassion and accommodation, yet instead, it was met with indifference and neglect, leaving him to bear the agonizing consequences alone.

11.     The depths of his suffering are immeasurable: the trauma he endures extends far beyond physical pain. It seeps into every facet of his existence, casting a shadow over his once vibrant life. Each day is a battle against the relentless tide of depression, anxiety, and physical agony, a battle he fights not only for himself but for his shattered family, robbed of the husband and father they once knew. As he grapples with the wreckage of his former life, he clings to the hope that justice will prevail and that, in the eyes of the law, his suffering will not be in vain.

## PARTIES

12.     Plaintiff is an individual who resides in Orange County, New York.

5

13.     Plaintiff has been employed by the DEFENDANT NEW YORK CITY FIRE DEPARTMENT ("FDNY") since 2006 and was promoted to Firefighter in 2013.

14.     At all relevant times, Plaintiff was an employee of the FDNY and the City within the meaning of the NYSHRL and NYCHRL.

15.     The Defendant NEW YORK CITY FIRE DEPARTMENT is an agency of THE CITY OF NEW YORK. THE NEW YORK CITY FIRE DEPARTMENT's principal office is located at 9 Metrotech Center, Brooklyn, New York 11201

16.     Defendant NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE is an agency of THE CITY OF NEW YORK. The NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE's principal office is located at 42-09 28th St, Long Island City, NY 11101.

17.     Defendant CITY OF NEW YORK is a municipality organized and existing under the laws of New York State. The City of New York was and is responsible for the policy, practice, supervision, and conduct of its Officers and Agencies at all relevant times hereto. The City of New York's principal office is located at 1 Centre Street, New York NY 10007.

18.     At all times herein mentioned, Defendants FDNY and City of New York have been an "employer" as defined by the NYSHRL (N.Y. Exec. Law § 292(5)) and the NYCHRL (N,Y.C. Admin. Code § 8-102).

19.     At all times herein mentioned, Defendants employed no fewer than fifteen (15) persons.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Additionally, This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201 and attorneys' fees and costs under 42 U.S.C. § 1988.

21.     Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367 to hear claims so related under the New York State Human Rights Law and the New York City Human Rights Law.

22.     Venue is proper in this district under 28 U.S.C. §1391(b) because Defendant maintains a principal place of business within this District and a substantial part of the events giving rise to the cause of action arose here.

## STATEMENT OF FACTS

**The City's Vaccine Mandate**

23.     Plaintiff, Obrian Pastrana, was a FDNY Firefighter, and had been employed by the FDNY since he was twenty years-old in 2006.

24.     On October 20, 2021, the New York City Commissioner of Health and Mental Hygiene issued the City Worker COVID-19 Vaccine Mandate ("Vaccine Mandate"). [1]

25.     The Vaccine Mandate required City employees, including the Plaintiff, to provide proof that they had been fully vaccinated against COVID-19 or they had received the first dose of a two-dose COVID-19 vaccine.

26.     The Vaccine Mandate defined "fully vaccinated" as "at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one

---

[1] Health Commissioner's Order, accessible at https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-city-employees.pdf

dose, or the second dose of a two-dose series of a COVID-19 vaccine as approved or authorized for use by the Food and Drug Administration or World Health Organization."

27.     The Vaccine Mandate required the FDNY and other City agencies to exclude any City employee who had not provided proof of vaccination from the premises at which they work beginning on November 1, 2021.

28.     The Defendants FDNY and the City did not collectively bargain with Plaintiff's Union, the Uniformed Firefighters Association, before implementing or enforcing the Vaccine Mandate.

29.     The Vaccine Mandate exempted uniformed Department of Corrections employees.

30.     The Vaccine Mandate provided for reasonable accommodations on its face pursuant to section eight of the Order of the New York City Commissioner of Health and Mental Hygiene.

31.     During this time, the City had mutual aid agreements with outside municipalities that did not have vaccination requirements and/or provided first responders to work unvaccinated with reasonable accommodation.

32.     The City also had volunteer Fire Departments who were not subject to the Vaccine Mandate or any vaccination requirement. The volunteer firefighters and personnel were permitted to work unvaccinated.

33.     The City promulgated a written policy regarding the implementation of the Vaccine Mandate and the reasonable accommodation process.

34.     This policy, entitled "FAQ on New York City Employees Vaccine Mandate" provided that "[a] sincerely held religious, moral, or ethical belief may be a basis for a religious accommodation."

35.     This policy also provided that the alternative to vaccination allowed which would not cause an undue hardship if an employee is granted a reasonable accommodation would be submission of a weekly negative test result.

36.     This policy also provided for medical accommodations.

37.     Permanent medical accommodations were provided for employees who had a documented contraindication such that an employee could not receive any FDA-authorized vaccines, with contraindications delineated in CDC clinical considerations for COVID-19 vaccine.

38.     Permanent medical accommodations were also available for any employees who were unable to mount an immune response due to preexisting immune conditions.

39.     Temporary medical accommodations were available for any employees who had pericarditis or myocarditis whether associated with COVID-19 vaccination or not.

40.     Temporary medical accommodations were also provided for employees within the isolation period after COVID-19 infection and employees within ninety days of antibody treatment. Permanent medical accommodations were provided for employees who were unable to mount an immune response to COVID-19.

41.     The Defendants granted firefighters like Plaintiff religious accommodations and allowed them to continue working.

42.     The Defendants granted firefighters like Plaintiff medical accommodations and allowed them to continue working.

43.     The City's policy also provided that employees who requested reasonable accommodations would continue working and submitting weekly negative test results while their accommodation request was pending.

44.     Due to administrative constraints and backlog, thousands of City employees, including many FDNY employees (and FDNY firefighters), continued working unvaccinated for many months after the Vaccine Mandate was implemented. Some of them were never placed on LWOP nor were they ever terminated, and instead continued to submit to weekly testing until the Vaccine Mandate was eventually lifted.

45.     Accommodation requests related to the COVID-19 Vaccine Mandate were handled by attorneys from the FDNY General Law Unit. Prior to the implementation of the COVID-19 Vaccine Mandate, accommodation requests fell under the purview of the attorneys in the FDNY's Equal Employment Opportunity Office. Notably, the attorneys in the General Law Unit had no previous involvement in processing accommodation requests before the introduction of the COVID-19 Vaccine Mandate.

46.     The COVID-19 vaccines do not cause prevention or transmission of the COVID-19 virus.[2]

47.     On July 27, 2021, the Centers for Disease Control and Prevention ("CDC") promulgated guidance that stated that "[v]accinated people can still become infected and spread the virus to others."[3]

---

[2] The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce,* N Engl J Med 2021; 385:1330-1332 (September 30, 2021) https://www.nejm.org/doi/full/10.1056/NEJMc2112981(last visited October 18, 2021).
[3] *Science Brief: COVID-19 Vaccines and Vaccination*, Centers for Disease Control and Prevention, Last Updated July 27, 2021, www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last accessed September 1, 2021)

48.    CDC Director Rochelle Walesnky admitted that the COVID vaccines do not prevent infection of transmission of COVID: "[W]hat they [the vaccines] can't do anymore is prevent transmission."[4]

49.    On July 30, 2021, CDC Director Rochelle P. Walensky, MD, MPH issued a public statement regarding similar viral loads that vaccinated and unvaccinated people infected with COVID-19 demonstrated[5]:

> On July 27, CDC updated its guidance for fully vaccinated people, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status. This decision was made with the data and science available to CDC at the time, including a valuable public health partnership resulting in rapid receipt and review of unpublished data.

> Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus. This finding is concerning and was a pivotal discovery leading to CDC's updated mask recommendation. The masking recommendation was updated to ensure the vaccinated public would not unknowingly transmit virus to others, including their vaccinated or immunocompromised loved ones.

50.    "[A]nyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others".[6]

51.    The CDC acknowledged that the vaccinated and unvaccinated are equally likely to spread the virus.[7]

---

[4] Madeline Holcomb, *Fully Vaccinated People Who Get a CoVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN Health (August 6, 2021) https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited October 18, 2021).

[5] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Centers for Disease Control and Prevention, July 30, 2021, available at www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html.

[6] *Omicron Variant: What You Need To Know*, CDC, updated March 29, 2022, accessible at https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html?s_cid=11734:omicron%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY22.

[7] Brown CM, et al., Outbreak of SARS-CoV-2 Infections, Including COVID 19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings-Barstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly

52.     The COVID-19 vaccines only reduce symptoms of those who are infected by COVID, but not transmission of the virus. They are, therefore, treatments, and not vaccines as that term has always been defined in the law.

53.     In fact, the CDC has actually changed its definitions of "vaccine" and "vaccination" to fit with the currently-available COVID Vaccines. Until recently, the Centers for Disease Control defined a "Vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[8]

54.     The CDC also previously defined "Vaccination" as: "The act of introducing a vaccine into the body to produce immunity to a specific disease."[9]

55.     Both prior definitions fit the common understanding of those terms. To be *vaccinated* meant that you should have lasting, robust immunity to the disease targeted by the *vaccine*.

56.     But on September 1, 2021, the CDC quietly rewrote these definitions. It changed the definition of a "Vaccine" to: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease *preparation that is used to stimulate the body's immune response against diseases*."[10] It changed the definition of "Vaccination" to: "The act of introducing a vaccine into the body to produce immunity to *protection from* a specific disease."[11]

---

Rep 2021;70:1059-1062. https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited October 18, 2021).

[8] *Immunization: The Basics* (archived version), Centers for Disease Control and Prevention https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).

[9] *Id.*

[10] *Immunization: The Basics*, Centers for Disease Control and Prevention https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).

[11] *Id.*

57.     In other words, the CDC has eliminated the word "immunity" from its definitions of "Vaccine" and "Vaccination." The CDC did so because it recognizes that the COVID Vaccines do not produce immunity to COVID-19.

58.     This is a critical factual and legal distinction. Legal authority to mandate medical treatment only derives under public health regulations.

59.     At the time that the Vaccine Mandate went into effect, the CDC held that delta and then omicron were the dominant strains in the United States; the COVID-19 vaccines or shots did not stop the transmission of delta or omicron; and that vaccination is mere "protection" against a disease and not "immunity" against the disease. Thus, there was no public health basis for mandating vaccination.

60.     The COVID vaccines pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID vaccines.

61.     The long-established CDC database VAERS (Vaccine Adverse Events

62.     Reporting System) demonstrates significantly higher reports of deaths and adverse events with the COVID vaccines than with prior vaccines.

63.     The COVID-19 vaccines can cause cardiac conditions, including inflammation of the heart and myocarditis. This is recognized by the CDC.

64.     Since, according to the CDC, the COVID vaccines do not prevent the infection or transmission of COVID, while at the same time, also according to the CDC, they can result in adverse events and deaths, there is no justification in the law for mandating them, and the City's City Worker COVID-19 Vaccine Mandate must therefore be declared unconstitutional. Additionally, there is no justification for mandating the Plaintiff to receive the COVID vaccination because he is medically contraindicated.

65.    As the CDC tacitly concedes by changing its own definitions of "Vaccine" and "Vaccination," the COVID vaccines are not vaccines in the traditional sense. In fact, the FDA classifies them as "CBER-Regulated Biologics" otherwise known as "therapeutics" which falls under the "Coronavirus Treatment Acceleration Program."[12]

66.    The government cannot mandate medical treatment. This is deeply rooted in this Nation's history and tradition.

**Pastrana's Medical Condition and Defendant's Failure to Accommodate**

67.    The Vaccine Mandate required City Workers, including Plaintiff, to receive the first dose of COVID-19 vaccine by October 29, 2021.

68.    The Defendants notified Plaintiff that he would be placed on Leave Without Pay and risk termination if he did not provide proof of vaccination by October 29, 2021.

69.    On October 29, 2021, the last day of the deadline, Plaintiff received the first dose of the Pfizer COVID-19 vaccination in order to comply with the City's Vaccine Mandate and continue working as a Firefighter.

70.    Immediately thereafter, he developed hives, swelling of his lips, sweats, chills, and body aches. Each day, he woke up with more significant swelling of his lips, face, and nose, as well as hives. Plaintiff took Benadryl, Allegra, and Claritin with no relief.

71.    As his symptoms got worse, on November 1, 2021, Plaintiff presented to the FDNY Bureau of Health Services ("BHS") Doctor, Dr. Barbara Cheung, who diagnosed Firefighter Pastrana with "COVID-19 vaccine side effect". He was put on medical leave from

---

[12] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics(last visited October 18, 2021); *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP),* https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited October 18, 2021).

October 30, 2021 to November 2, 2021. Dr. Cheung diagnosed Plaintiff with "COVID-19 VACCINE SIDE EFFECT" and noted that this was "SC" (Service-Connected).

72.     Plaintiff told Dr. Cheung he was afraid to get the second dose because of his apparent allergic reaction and expressed concerns over getting the second dose. Dr. Cheung dismissed his concerns, and told him to continue getting vaccinated and that he was required to be fully vaccinated to continue his employment with the FDNY.

73.     According to the Centers for Disease Control ("CDC"), a "severe allergic reaction" after a previous dose of the COVID-19 vaccination or an "immediate allergic reaction of any severity" to a previous dose are contraindications to any future doses of the vaccine. This was the most up-to-date guidelines published by the CDC at the time that Plaintiff received the COVID-19 vaccines.

74.     Plaintiff continued to suffer symptoms of hives, significant swelling of his lips, face, and nose, as well as sweats, chills, and body aches.

75.     On November 15, 2021, Firefighter Pastrana reported to duty at the firehouse. While working, he had to be taken from the firehouse to the hospital in an ambulance while on active duty due to the worsening and severity of his allergic reaction, which included rash, hives, and swelling in the lips. He was immediately treated in the ambulance intravenously, and then he was seen in the emergency room and was given epinephrine, a drug commonly used to treat anaphylaxis, along with prednisone. He was prescribed with prednisone and an EpiPen.

76.     Plaintiff was put on medical leave by the FDNY and never returned to the firehouse again.

77.     On November 16, 2021, Firefighter Pastrana presented to the FDNY BHS and was seen by Dr. N. Chandswang. Firefighter Pastrana expressed his concerns about receiving the

second dose due to his ongoing severe and pervasive allergic reaction, and the fact that he was still taking prednisone. Dr. Chandswang told Firefighter Pastrana that he would have to be fully vaccinated in order to work.

78.     After his emergency room visit on November 15, 2021, Plaintiff had to take prednisone to keep his symptoms at bay. During this time, even on prednisone, he was still suffering from shortness of breath, swelling, and hives.

79.     As soon as he discontinued the prednisone, his symptoms worsened to the point where he needed to be rushed to the emergency room again.

80.     On November 21, 2021, he was again seen in the ER with "worse shortness of breath and hives". The After Visit Summary from the Garnet Health Medical Center Emergency Department shows that Plaintiff was diagnosed with anaphylaxis. He was prescribed prednisone for thirty days.

81.     At every BHS doctor appointment, the Plaintiff articulated the fact that he was having ongoing severe allergic reaction to the COVID-19 vaccine and that he was concerned about getting a second dose. Despite his ongoing severe allergic reaction to the first dose, the FDNY not only recommended, but required, Firefighter Pastrana to receive the second dose of the COVID-19 vaccine under the threat of job loss.

82.     The FDNY should have immediately accommodated Plaintiff with weekly PCR testing in lieu of receiving the second dose of the COVID-19 vaccination.

83.     The FDNY promulgated a "Buckslip and Memo" to employees, including Plaintiff, outlining the procedures regarding the City's COVID-19 Vaccine Mandate.

84.    The Memo stated: "Employees who are awaiting determination on a reasonable accommodation request submitted on or before October 27 or who were granted a reasonable accommodation will be required to submit to weekly testing."

85.    The Memo specified that accommodated FDNY employees would "submit a weekly negative test instead of submitting proof of vaccination" to FDNY Human Resources.

86.    As of January 11, 2022, the FDNY granted approximately 105 reasonable accommodations to the COVID-19 Vaccine Mandate.

87.    As of December 27, 2022, the FDNY granted approximately 36 reasonable accommodations specifically for Fire Operations members (this includes active-duty firefighters) of the FDNY. 30 of those accommodations were for medical reasons, and 6 were for religious reasons.

88.    Other active duty firefighters were accommodated with weekly PCR testing.

89.    On November 23, 2021, at the FDNY's direction, despite fear and serious reservations, Firefighter Pastrana received the second dose of the COVID-19 vaccine. After his second dose, his medical condition further deteriorated, and he developed shortness of breath, chest pain, decreased oxygen levels, and a worsening of his swelling and hives. He presented to his doctor at Crystal Run Healthcare and was transferred to the emergency room. He was again seen in the ER and treated with IV steroids and a full regimen for allergic reactions.

90.    "A note from Saint Lukes Cornwall Hospital emergency room, dated 11/30/2021, noted the member had acute urticaria[13] post COVID vaccine injection." The member was treated with IV methylprednisolone and IV famotidine as well as Benadryl. As of a follow-up on

---

[13] Urticaria, also known as hives, is a skin reaction that causes itchy welts. *Chronic hives*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/chronic-hives/symptoms-causes/syc-20352719#:~:text=Hives%20—%20also%20called%20urticaria%20(ur,chronic%20hives%20isn%27t%20clear (last visited October 20, 2023).

11/30/2021, the member was on cyclobenzaprine, 10 mg, 3 times daily, famotidine, 40 mg, twice daily, ibuprofen, 600 mg, 3 times daily, as needed Xyzal, 5 mg, 3 times daily, and metformin, 500 mg daily. These medications were, in part, instituted for swollen lips and hives."

91.     Despite medication, his symptoms continued, leading to cardiac testing by Cardiologist Dr. Totonelly, MD/JD FACC, FSCAI, of Dutchess Medical Associate, PC. which revealed reduced Left Ventricular Ejection Fraction and fibrosis. Dr. Totonelly stated that he "definitely suffers from side effects due to the vaccine"

92.     Plaintiff followed up with Dr. Totonelly on January 19 and January 24, 2022. On January 25, 2022, Firefighter Pastrana was seen by FDNY BHS Dr. Hurwitz, who diagnosed him with myocarditis and COVID-19 vaccine side effect, both of which were labelled "service connected." Dr. Kurwitz noted that Plaintiff "was "recently seen by cardiologist who feels he has active subacute myocarditis".

93.     Again on February 9, 2022, Plaintiff was seen by another FDNY BHS doctor – Dr. Dianne Acuna, who also diagnosed Firefighter him with myocarditis and COVID-19 vaccine side effect, both of which were noted to be service connected."

94.     On February 22, 2022, Plaintiff had a cardiac MRI at NYU Langone, referred by FDNY BHS Dr. Acuna: The findings were LV diminished systolic function (LVEF 40%), RV mildly diminished systolic function (RVEF 45%), and "There are patchy and linear areas of mid wall LGE involving the basal and mid LV septum suggestive of nonischemic myocardial fibrosis". There is a relative hypokinesia of the mid LV septum and some dyskinesia of the distal mid and apical LV lateral wall suggestive of dyssynchrony."

95.     The CDC has declared that "evidence from multiple vaccine safety monitoring systems in the United States and around the globe supports a causal association between mRNA

18

COVID-19 vaccines (i.e., Moderna or Pfizer-BioNTech) and myocarditis and pericarditis."
*Clinical Considerations: Myocarditis and Pericarditis after Receipt of COVID-19 Vaccines Among Adolescents and Young Adults*, Centers for Disease Control, available at https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html (last accessed October 20, 2023).

96.    On March 2022, Firefighter Pastrana was diagnosed with COVID-19.

97.    The COVID-19 vaccine failed to prevent Plaintiff from becoming infected with COVID-19.

98.    On May 12, 2022, Plaintiff's EKG report noted "Tachycardia" and a "hypertensive response to exercise", and indicated a patient history of "Tachycardia, CMP, Myocarditis, Chest pain, Dyspnea/SOB, Borderline DM." The Plaintiff "achieved greater than 85% of maximum predicted heart rate".

99.    On May 24, 2022, Plaintiff underwent a cardiac MRI ("35 year old man with history of myocarditis undergoing evaluation for follow-up."), which indicated 1) interval improvement in biventricular function with LVEF currently 53% and RVEF 55%, and 2) "persistent mild linear mid myocardial late gadolinium enhancement within the basal anterior septum."

100.    On February 28, 2023, Plaintiff was examined by FDNY BHS. The Examination Report, signed by Dr. Acuna, Dr. Cheng, and Dr. Ly ("the Three Physician Board"), stated:

> CARDIO: this November is 2 years since was FD and does not feel he will be able to ever return to FD. Thus this is a 3PB for fitness/disability retirement…
> 3PB… 36 y/u FF OTJ 10 years who developed swollen lips, sweats, chills and body aches after receiving COVID vaccine on 10/29… he was seen in the ER (ESR was elevated 22, D-dimer normal 181), on 11/15 he again developed hives and swollen lips and was given Epi in the ER along with prednisone. The plan was to RTFD 11/22 however on 11/21 he against went to ER with SOB hives and more prednisone was given. He received the second vaccine on 11/23 with fatigue and aches but plan again was to

RTFD 11/29 the allergic reaction worsened and he was given IV steroids… he was started on a regimen for allergic reactions but given the persistent chest pain and SOB, he underwent cardiac testing that included ECHO with reduced LVEF. He continued to have chest pain and DOE and ultimately was diagnosed with COVID in March of 2022. Persistent symptoms despite medications and obtained cardiac MRI that revealed patchy areas of fibrosis as well as decreased LVEF and RVEF thus the diagnosis was that of myocarditis… his medications were adjusted to include entresto, HCTz, … by June 2022 MRI revealed persistent fibrosis despite improved LVEF; medications still included entresto, HCTZ, baby asa, metformin… no change in weight at this time. Reviewed most recent ECHO… still having DOE and has brosis but improvement in the LVEF thus a stress test was performed and he was only able to achieve 10 METS due to DOE and chest pain …. Since that time, he contintues to experience dyspnea doing activities of daily living, (playing with his young daughter, etc.) and the chest pains come and go all the time… will have pulmonary evaluation to r/o any pulmonary etiology for his symptoms however given the persistent. DOE/CP and the diagnosis of myocarditis with persistent fibrosis evidence of MRI, he can be incapacitated suddenly thus is unfit permanently for RTFD… recommended LD/LSS."

101.    The diagnosis was marked as Service-Connected.

102.    The same day – on February 28, 2023, the FDNY Chief Medical Officer, Karen Hurwitz, M.D., submitted the Three Physician Board's diagnoses and opinions to the Fire Commissioner. Firefighter Pastrana was diagnosed with: (1) allergic reaction to COVID vaccine, (2) Myocarditis, and (3) COVID disease. Dr. Hurwitz opined that Firefighter Pastrana is permanently unfit for firefighting duties. Dr. Hurwitz also found that Firefighter "is at an increased risk for sudden incapacitation" "[g]iven the findings on the MRI, the history of the COVID, the history of the allergic reaction to the vaccine, and the persistent findings of shortness of breath, chest pain, fatigue, and fibrosis on cardiac MRI.

103.    On March 10, 2023, Firefighter Pastrana was evaluated by FDNY BHS Dr. Anna Nolan. The "M.D.s Report" states: "referred to have pulmonary evaluation to r/o [rule out] any pulmonary etiology for his symptoms however given the persistent DOE/CP [dyspnea on exertion/chest pain] and the diagnosis of myocarditis with persistent fibrosis evidence of MRI, he can be incapacitated suddenly thus is unfit permanently to RTFD [return to full duty]." The

report also noted "vaccine side effect with associated myocarditis." After the examination he was taken off full duty and put on light duty and recommended for retirement. The diagnosis code was service connected. Additionally, the chart on the examination report noted a service-connected diagnosis of "COVID-19 VACCINE SIDE EFFECT". The chart also noted a service-connected diagnosis of "MYOCARDITIS". The chart also noted a service-connected diagnosis of "COVID19 CONFIRMED". And a service-connected diagnosis of "ADJUST DISORDER W/ ANXIETY, DEP".

104.    On March 10, 2023, Fire Commissioner Laura Kavanaugh processed the Fire Commissioner's Application based on the unanimous opinion of the Three Physician Board.

105.    On May 2, 2023, after interviewing Plaintiff, the Subchapter 2 Medical Board ("Cardiology Medical Board"), issued the following determination:

> Based upon our review of all medical records and interview with the member, it is the unanimous opinion of the Subchapter 2 Medical Board that FF Pastrana is permanently disabled as a consequence of myocarditis with ongoing symptoms, status post COVID vaccinations which precludes him from firefighting duties. Therefore, we recommend that he be granted an Ordinary Disability retirement for his Fire Commissioner's application for myocarditis with ongoing symptoms. He may engage in gainful and suitable occupation.

106.    No reason was given for recommending Ordinary Disability as opposed to ADR.

107.    On June 28, 2023, the Board of Trustees had its regular meeting and heard Plaintiff's request for Accidental Disability Retirement.

108.    The Board of Trustees is comprised of twenty-four votes. The United Firefighters Association ("UFA") and United Fire Officers Association make up twelve votes of the total votes ("Union Board Members"), and representatives from the Fire Commissioner, Department of Finance, Mayor's Office, and Comptroller's Office make up the other twelve votes ("City Board Members").

109.    At the meeting, one of the UFA members made a motion to increase Plaintiff's pension from Ordinary Disability to Accidental Disability. It came down to a split-vote. All of the Union Board Members voted in favor of upgrading Plaintiff to ADR Benefits and all of the City Board Members voted against upgrading Plaintiff.

110.    Plaintiff brought an Article 78 proceeding against the New York City Fire Pension Fund, challenging the denial of Accidental Disability Retirement benefits. The Supreme Court in New York County denied the petition, on the basis that Plaintiff's vaccine injury was incidental – not accidental – and that it arose out of his performance of routine duties, receiving the COVID-19 vaccine, not as a result of an unexpected event, as required to meet the definition of accident under the New York City Administrative Code. Pastrana v. New York City Fire Pension Fund, et. al., Index No. 160515/2023 (Sup Ct., New York Cnty, April 3, 2023).

111.    As a result of the Defendants' Vaccine Mandate and their failure to accommodate, Plaintiff suffers from depression and anxiety. He regularly receives ongoing mental health treatment from a specialist.  He has been diagnosed with ongoing posttraumatic stress disorder, and adjustment disorder with depressed mood. He deals with frustration, intrusive thoughts, sadness, anger, grief, self-doubt, guilt, loss, regret, feels invisible, and is completely devastated by what has happened to him.

112.    As a result of the Defendants' Vaccine Mandate and their failure to accommodate, Plaintiff physically suffers from permanent cardiovascular disability, chronic fatigue, trouble breathing, chest pain, loss of energy, shortness of breath. He cannot walk more than short distances. He must be on medication for the long-term. He is still on levocetirizine daily. If he stops taking it, hives reappear. He also must take Entresto and HCTZ daily due to the heart failure. He has to carry around an inhaler (Albuterol) and an EpiPen.

113.    Personally, his family life is also suffering. He cannot play catch with his young daughter anymore. He cannot help his wife around the house. He cannot afford to make mortgage payments or afford basic necessities due to the loss of income being on ordinary disability. He continues to struggle with immense loss over his career as a firefighter, his health, longevity of life, being physically able-bodied, and never having complete heart function again.

## CLAIMS

### FIRST CAUSE OF ACTION
**(Violation of the Fourteenth Amendment Substantive Due Process – 42 U.S. § 1983)**

114.    Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

115.    The Vaccine Mandate violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes rights of personal autonomy, self-determination, bodily integrity and the right to reject medical treatment.

116.    Additionally, the Defendants' failure to accommodate the Plaintiff was an arbitrary application of the Vaccine Mandate, without regard for Plaintiff's health, and resulted in an unconstitutional infringement of Plaintiff's substantive due process rights, as the government cannot infringe upon an individual's liberty without compelling justification.

117.    The COVID vaccines are not vaccines, as that term has traditionally been understood, but are, as a factual matter, treatments. They are referred to herein as vaccines, but they are not. They are treatments. Indeed, the CDC even recently changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word, "immunity."

118.    The ability to decide whether to accept or refuse medical treatment is a fundamental right.

119.    Even if the COVID vaccines were traditional vaccines, it is well-settled that the government cannot require vaccination when they are medically contraindicated. "It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38–39, 25 S. Ct. 358, 366, 49 L. Ed. 643 (1905).

120.    Despite being diagnosed with a severe allergic reaction to the first dose of the vaccine, which is a medical contraindication per CDC guidelines, the Plaintiff was coerced into receiving the second dose under the threat of job loss. This action infringed upon his fundamental right to refuse unwanted medical treatment, a right that is deeply rooted in the Nation's history and tradition and is protected by the Due Process Clause.

121.    This blatant disregard for Plaintiff's medical condition, coupled with coercion under threat of job loss, directly violated his right to bodily integrity and to refuse medically contraindicated treatment.

122.    Accordingly, the Vaccine Mandate violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

123.    Plaintiff has a constitutionally protected liberty interest in refusing the COVID-19 vaccine, which was an unwanted medical treatment.

124.    Because the COVID vaccines are not treatments, and not vaccines, strict scrutiny applies. The US Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). It has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.

*Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990),

see also *id*. at 223 (further acknowledging in dicta that, outside of the prison context, the right to

refuse treatment would be a "fundamental right" subject to strict scrutiny).

125.    As mandated medical treatments are a substantial burden, Defendants must prove

that the Vaccine Mandate is narrowly tailored to meet a compelling interest.

126.    No such compelling interest exists because, as alleged above, the COVID

vaccines are not effective against COVID in that they do not prevent the recipient from

becoming infected, getting reinfected, or transmitting COVID to others.

127.    The COVID vaccines may have been somewhat effective against the original

COVID strain, but that strain has come and gone, and the COVID vaccines— designed to fight

yesterday's threat—were simply ineffective against subsequent variants, including the variants

which were the dominant strain of the virus in the United States at the time the Vaccine Mandate

went into effect, namely, omicron.

128.    Since the COVID vaccines are ineffective against COVID, there can be no

compelling interest to mandate their use.

129.    But even if there were a compelling interest in mandating the COVID

vaccinations, the Vaccine Mandate is not narrowly tailored to achieve such an interest.

130.    The blanket Vaccine Mandate ignores individual factors increasing or decreasing

the risks that the Plaintiff—indeed, all City employees—pose to themselves or to others.

131.    Defendants entirely disregard whether employees have already obtained

natural immunity despite the fact that natural immunity does actually provide immunity whereas

the COVID vaccines do not.

132.    Defendants also disregarded that Plaintiff was medically contraindicated from receiving the COVID vaccine.

133.    Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

134.    Indeed, even if the test set forth in *Jacobson* was the appropriate standard, which it is not, the Vaccine Mandate would still fail to satisfy that standard for the reasons set forth above.

135.    "[I]f a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 31, 25 S. Ct. 358, 363, 49 L.Ed. 643 (1905).

136.    While the City of New York sought to enforce the Vaccine Mandate under the guise of public health, it failed to apply this mandate uniformly, allowing exceptions for volunteer firefighters and mutual aid responders. Additionally, the City's own data and policy show that vaccinated individuals could still transmit the virus, undermining the necessity of forcing Plaintiff to take a vaccine that posed a severe risk to his health. As such, the City's actions were neither narrowly tailored nor supported by a compelling state interest, as required to justify infringing upon Plaintiff's substantive due process rights.

137.    As set forth more fully above, the risk of death from COVID is extremely low.

138.    The available vaccines for COVID generally do not confer sterile immunity. Rather, they simply lessen the severity of symptoms for individuals who receive them. They are actually a prophylactic treatment for COVID and not a vaccine at all.

139.    COVID-19 vaccines have been shown to cause severe adverse reactions in certain individuals, as evidenced by Plaintiff's own experience.

140.    There is a link between mRNA COVID-19 vaccines and an increased risk of myocarditis.

141.    The CDC recognized both anaphylaxis and myocarditis as serious adverse events following COVID-19 vaccination.

142.    Plaintiff was injured by the COVID-19 vaccine.

143.    Adequate alternatives to vaccination existed, including PCR testing which the Defendants already implemented for accommodated City employees.

144.    The Defendants had identified many mitigation strategies which could have been used individually or layered as an adequate alternative to vaccination.

145.    The City's *Managing the Office in the Age of COVID-19*, effective October 20, 2021, is a written guidance that provides "risk mitigation strategies" to reduce the risk of COVID-19 transmission.

146.    Various public health organizations, including but not limited to Centers for Disease Control, OSHA, and the New York City Department of Health and Mental Hygiene, had identified mitigation strategies which were adequate alternatives to vaccination.

147.    Additionally, the City's own written policy provided for alternative accommodations, including weekly testing, for those with medical contraindications. Despite this, the Defendants failed to offer Plaintiff this alternative and instead coerced him into receiving a second vaccine dose, further exacerbating his medical condition and violating his constitutional rights.

148.    Given these facts, as more fully set forth above, the Vaccine Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law. It is therefore unconstitutional regardless of which standard of review is applied.

149.    The Defendants' unconstitutional actions are the cause in fact of the Plaintiff's injuries, which include, the deprivation of his constitutionally protected rights, physical pain and suffering, disability, the loss of a normal life, the costs of medical care, reduced life expectancy, an end to his career as a firefighter, lost wages, and emotional pain and suffering, among others.

150.    Pursuant to 42 U.S.C. § 1983 and 28 U.S. Code §§ 2201-02 and other applicable law, Plaintiff is entitled to a declaration that the Vaccine Mandate is unlawful, compensatory and punitive damages, and any further relief which may be appropriate.

## SECOND CAUSE OF ACTION
### (Failure to Accommodate in Violation of the New York City Human Rights Law)

151.    Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

152.    At all relevant times, the NYCHRL has been in full force and effect and has applied to Defendants' conduct.

153.    At all relevant times, the Defendants had the power to hire, promote, and discharge Plaintiff and were Plaintiff's employers.

154.    Pursuant to the NYCHRL, it is "an unlawful discriminatory practice" for an employer "not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the

disability is known or should have been known by the [employer]." New York City Admin. Code § 8-107(15)(a).

155.     Plaintiff could have easily satisfied the essential requisites of his job as a firefighter with a reasonable accommodation of weekly PCR testing.

156.     Plaintiff vaccination status did not prevent him from fulfilling the obligations of her position.

157.     Other FDNY firefighters were permitted to refuse the vaccine and remain employed with the FDNY by submitting to weekly PCR testing .

158.     Other FDNY firefighters were granted medical accommodations and allowed to continue working.

159.     The Defendants required Plaintiff to receive the COVID-19 vaccine to retain his employment.

160.     However, vaccination is not a condition of employment for those who are eligible for a religious or medical accommodation.

161.     Under the NYCHRL, disability is defined broadly as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8–102.

162.     "The term 'physical, medical, mental, or psychological impairment' means:

(a) An impairment of any system of the body; including, but not limited to, the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system; or

(b) A mental or psychological impairment.

Id.

163.    Plaintiff was disabled under the broad definition of disability pursuant to the NYCHRL.

164.    Plaintiff's allergic reaction to the COVID-19 vaccination, which caused persistent hives, significant swelling of his lips, face, and nose, as well as shortness of breath, sweats, chills, and body aches, represents a physical impairment within the NYCHRL's broad definition of disability.

165.    Plaintiff's permanent cardiovascular disability, including myocarditis and heart failure, which causes chronic fatigue, trouble breathing, chest pain, loss of energy, shortness of breath, also represents a physical impairment.

166.    Because of Plaintiff's allergic reaction to the COVID-19 vaccination and his ongoing and persistent symptoms, he was medically unable to receive the second dose of the COVID-19 vaccination and unable to comply with the City's Vaccine Mandate.

167.    His disability precluded him from complying with the Vaccine Mandate.

168.    The FDNY was on notice of Plaintiff's disability.

169.    The FDNY BHS doctors evaluated Plaintiff and diagnosed him with a COVID-19 side effect.

170.    The FDNY was aware of his allergic reaction and placed him on medical leave because of it.

171.    The FDNY sent him to the emergency room in an ambulance because of the worsening of his allergic reaction.

172.    The CDC guidelines clearly delineated an allergic reaction to a prior dose of the COVID-19 vaccination as a contraindication from receiving any further doses.

173.    Despite being medically unable to comply with the Defendants' work requirement of being fully vaccinated, the Defendants failed to accommodate the Plaintiff, and he was faced with the choice of either getting the second dose or losing his job.

174.    The FDNY and City terminated other firefighters who failed to comply with the Vaccine Mandate.

175.    However, the FDNY granted other firefighters' reasonable accommodations, allowing those firefighters to submit weekly PCR testing instead of receiving the COVID-19 vaccine.

176.    Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

177.    Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the Defendants' workplace.

178.    Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

179.    Plaintiff received the second dose in order to keep his job because of the Defendants' failure to accommodate him.

180.    That second dose caused him to suffer from myocarditis and heart failure, and he now has a permanent cardiovascular disability.

181.    The FDNY then deemed him unfit for duty and ended his career as a firefighter.

182.    As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses,

pension, and other employment benefits, for which she is entitled to an award of monetary damages which will be determined at trial, and other relief.

183.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

184.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is thus entitled to injunctive and declaratory relief, as well as compensatory damages, including pain and suffering, and punitive damages for the injuries and loss sustained as a result of Defendants' unlawful discriminatory conduct under the NYCHRL, in an amount to be determined at trial.

185.     Defendants willfully violated Plaintiff's right to a reasonable accommodation.

186.     Defendants knew they were acting in violation of the law.

187.     The Defendants knew that Plaintiff was medically unable to comply with the City's Vaccine Mandate.

188.     The Defendants knew that Plaintiff was disabled and contraindicated from receiving the second dose of the COVID-19 vaccine.

189.     The Defendants knew that Plaintiff qualified for a reasonable accommodation.

190.     Defendants refused to even consider accommodating Plaintiff.

191.     Defendants knew that they were legally required to engage in an interactive process but failed to engage in such process with Plaintiff.

192.     Defendants acted with malice.

32

193.    Defendants' actions amount to willful or wanton negligence.

194.    Defendants' discrimination was willful.

195.    Defendants' discrimination was reckless.

196.    Defendants consciously disregarded Plaintiff's right to a reasonable accommodation.

197.    Defendants consciously disregarded the fact that Plaintiff was entitled to a medical accommodation and required him to receive the second dose of the COVID-19 vaccination.

198.    Defendants consciously disregarded Plaintiff's health and safety, knowingly putting him in grave danger and risk of death by requiring him to receive the second dose of the COVID-19 vaccination.

199.    Defendants consciously disregarded the CDC contraindications which clearly indicated that Plaintiff could not receive the second dose of the COVID-19 vaccine.

200.    Defendants' conduct was so reckless as to amount to a conscious disregard of the rights and life of the Plaintiff.

201.    Defendants acted with reckless indifference to Plaintiff's rights, health, safety, and wellbeing.

202.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to punitive damages under NYCHRL in an amount to be determined at trial.

203.    Plaintiff is further entitled to an award of attorney's fees, expert fees, and other costs under the NYCHRL. N.Y.C. Admin. Code §8-502(g).

## THIRD CAUSE OF ACTION

### (Failure to Accommodate in Violation of the NYSHRL)

204.    Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

205.    At all relevant times, the NYSHRL has been in full force and effect and has applied to Defendants' conduct.

206.    The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for an employer… to refuse to provide reasonable accommodations to the known disabilities…of an employee…" N.Y. Executive Law § 296(3)(a).

207.    For purposes of the State Human Rights Law, "the term 'disability' means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." N.Y. Exec. Law § 292 (21).

208.    "Undue hardship" is defined as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10)(d).

209.    If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical

knowledge or on the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

210.    At all relevant times, the Defendants were employers of Plaintiff.

211.    Plaintiff is a person with a disability.

212.    Defendants were on notice of Plaintiff's disability.

213.    Plaintiff informed Defendants that he was unable to comply with the City's Vaccine Mandate, which required firefighters to receive the second dose of the COVID-19 vaccine.

214.    Defendants refused to accommodate Plaintiff.

215.    The Defendants required Plaintiff to receive the COVID-19 vaccine to retain his employment.

216.    Plaintiff was able to perform the essential duties of his job with a reasonable accommodation.

217.    Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

218.    Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the Defendants' workplace.

219.    Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

220.    Defendants failed to engage in any interactive process with Plaintiff regarding a reasonable accommodation.

221.    Instead Defendants flat-out refused to even consider accommodating Plaintiff.

222.    Defendants failed to engage in good faith with Plaintiff in order to understand his need for accommodation.

223.    Defendants violated the NYSHRL by failing to provide Plaintiff with a reasonable accommodation without first engaging in an interactive process.

224.    Defendants refused to allow Plaintiff to keep his job because he was permanently disabled from the COVID-19 vaccine.

225.    Plaintiff was permanently injured because the Defendants failed to provide a reasonable accommodation to the Vaccine Mandate.

226.    As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which he is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

227.    As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

228.    Plaintiff is thus entitled to injunctive and declaratory relief, as well as compensatory and punitive damages for the injuries and loss sustained as a result of Defendants' unlawful discriminatory conduct under the NYSHRL, in an amount to be determined at trial.

229.    Defendants willfully violated Plaintiff's right to a reasonable accommodation.

230.    Defendants knew they were acting in violation of the law.

231.    The Defendants knew that Plaintiff was medically unable to comply with the City's Vaccine Mandate.

232.    The Defendants knew that Plaintiff was disabled and contraindicated from receiving the second dose of the COVID-19 vaccine.

233.    The Defendants knew that Plaintiff qualified for a reasonable accommodation.

234.    Defendants refused to even consider accommodating Plaintiff.

235.    Defendants knew that they were legally required to engage in an interactive process but failed to engage in such process with Plaintiff.

236.    Defendants acted with malice.

237.    Defendants' actions amount to willful or wanton negligence.

238.    Defendants' discrimination was willful.

239.    Defendants' discrimination was reckless.

240.    Defendants consciously disregarded Plaintiff's right to a reasonable accommodation.

241.    Defendants consciously disregarded the fact that Plaintiff was entitled to a medical accommodation and required him to receive the second dose of the COVID-19 vaccination.

242.    Defendants consciously disregarded Plaintiff's health and safety, knowingly putting him in grave danger and risk of death by requiring him to receive the second dose of the COVID-19 vaccination.

243. Defendants consciously disregarded the CDC contraindications which clearly indicated that Plaintiff could not receive the second dose of the COVID-19 vaccine.

244. Defendants consciously disregarded Plaintiff's right to an interactive process before refusing to accommodate Plaintiff.

245. Defendants' conduct was so reckless as to amount to a conscious disregard of the rights and life of the Plaintiff.

246. Defendants acted with reckless indifference to Plaintiff's rights, health, safety, and wellbeing.

247. As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to punitive damages under NYSHRL in an amount to be determined at trial.

248. Plaintiff is further entitled to an award of attorney's fees, expert fees, and other costs under the NYSHRL. Executive Law § 297(10).

## FOURTH CAUSE OF ACTION

**(Failure to Engage in a Cooperative Dialogue in Violation of the NYCHRL)**

249. Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

250. The NYCHRL requires employers to engage in a cooperative dialogue with an employee who requests a reasonable accommodation.

251. The NYCHRL provides a separate cause of action against employers who fail to engage in a cooperative dialogue with employees, like Plaintiff, who request a reasonable accommodation:

> It shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an

accommodation or who the covered entity has notice may require such an accommodation: (2) Related to a disability as provided in subdivision 15 of this section.

N.Y.C. Admin. Code § 8-107 (28)(a).

252.    Defendants were obligated to engage in a cooperative dialogue with Plaintiff regarding his need for a reasonable accommodation to the Vaccine Mandate.

253.    Defendants were on notice that Plaintiff required a reasonable accommodation.

254.    Defendants were on notice that Plaintiff was disabled.

255.    Defendants were on notice that Plaintiff was experiencing a severe allergic reaction to the first dose of the COVID-19 vaccination.

256.    Defendants were on notice that the CDC delineated a severe allergic reaction to the first dose as a contraindication to receiving any further doses of the COVID-19 vaccine.

257.    Defendants refused to engage in any cooperative dialogue and simply refuse to provide a reasonable accommodation to Plaintiff.

258.    Defendants violated N.Y.C. Admin. Code § 8-107 (28)(a)(1) by failing to engage in a cooperative dialogue with Plaintiff regarding a reasonable accommodation to the Vaccine Mandate.

259.    The Plaintiff could have easily satisfied the essential requisites of his job as a firefighter with a reasonable accommodation of weekly PCR testing.

260.    Other firefighters were allowed to continue working with a reasonable accommodation of weekly PCR testing.

261.    Pursuant to the NYCHRL:

The term "cooperative dialogue" means the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the

difficulties that such potential accommodations may pose for the covered entity.

N.Y.C. Admin. Code § 8-102.

262.    The FDNY never had any communications with Plaintiff regarding his accommodation needs.

263.    Instead, the Defendants ignored his accommodation needs and his expressed concerns that he could not medically tolerate the second dose of the COVID-19 vaccine and insisted that he must receive the second dose of the COVID-19 vaccine to comply with the Vaccine Mandate.

264.    The FDNY never had any communications with Plaintiff regarding any potential accommodations that may address his accommodation needs.

265.    The FDNY never had any communications with Plaintiff regarding the difficulties that any potential accommodations may pose to Defendants.

266.    Defendants knew that they were legally required to engage in a cooperative dialogue but failed to engage in such dialogue with Plaintiff.

267.    Defendants knew that they were legally required to engage in an interactive process but failed to engage in such process with Plaintiff.

268.    Defendants did not consider Plaintiff's individual job duties.

269.    Defendants acted with malice.

270.    Defendants' actions amount to willful or wanton negligence.

271.    Defendants' discrimination was willful.

272.    Defendants' discrimination was reckless.

273.    Defendants consciously disregarded Plaintiff's right to a cooperative dialogue.

274.    Defendants' conduct was so reckless as to amount to a conscious disregard of the rights of Plaintiff.

275.    Defendants acted with reckless indifference to Plaintiff's rights.

276.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to punitive damages under NYCHRL in an amount to be determined at trial.

277.    As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which he is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief

278.    As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

279.    As a direct and proximate result of Defendants' violations of the NYCHRL, N.Y.C. Admin. Code § 8-107 (28)(a)(1) and § 8-107 (28)(e), Plaintiff is entitled to declaratory and injunctive relief and Defendants are liable to Plaintiff for compensatory damages, including pain and suffering, and punitive damages in an amount to be determined at trial  pursuant to N.Y.C. Admin. Code §8-502(a), and for costs and reasonable attorney's fees pursuant to N.Y.C. Admin. Code §8-502(g).

## Prayer for Relief

**WHEREFORE**, the Plaintiff prays that this Court grant judgment to her containing the following relief:

A.      A declaratory judgment that the Defendants' actions violated the Plaintiff's rights to Substantive Due Process pursuant to the Fourteenth Amendment to the United States Constitution;

B.      A declaratory judgment that the Defendants' failure to accommodate and failure to engage in a cooperative dialogue with Plaintiff are unlawful discriminatory practices under the New York City Human Rights Law and the New York State Human Rights Law;

C.      An award to Plaintiff of compensatory damages for the Plaintiff's lost wages, back pay, front pay, overtime, and benefits, and the financial consequences of Defendants' actions, in an amount to be determined at trial;

D.      An award to Plaintiff of compensatory damages for the physical and emotional pain and suffering, physical harm, loss of normal life, decreased life expectancy, injury, humiliation, mental anguish, damages to reputation and livelihood, and emotional distress sustained by her in an amount to be determined at trial;

E.      An award to Plaintiff for the deprivation of his constitutional and statutory rights;

F.      An award to Plaintiff for costs in this action, including reasonable attorney's fees and expert fees under federal law, the New York City Human Rights Law, and New York State Human Rights Law;

G.      An award to Plaintiff for punitive damages in an amount to be determined at trial, in order to punish the Defendant's intentional unlawful discriminatory practices;

H.     An order for civil fines and penalties pursuant to New York Executive Law § 297(9);

I.     An award of pre- and post-judgment interest on all amounts awarded to the Plaintiff at the highest rates and from the earliest dates allowed by law on all causes of action;

J.     Such other and further relief this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury for all the issues leaded herein so triable.

Respectfully submitted,

Christina Martinez, Esq.
Law Offices of Christina M. Martinez
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

***Attorney for Plaintiff***

Dated: Staten Island, New York
        October 20, 2024