UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

O'BRIAN PASTRANA,

      Plaintiff,

   v.

NEW YORK CITY FIRE DEPARTMENT,
NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE,
AND CITY OF NEW YORK,

      Defendants.

# PLAINTIFF'S MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANTS'
# MOTION TO DISMISS THE AMENDED COMPLAINT

**Christina Martinez, Esq.**
Law Offices of Christina M. Martinez
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

**Sujata S. Gibson,**
Gibson Law Firm, PLLC
120 Buffalo Street, Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES …………………………………………………………… iii

PRELIMINARY STATEMENT …………………………………………………..…..… 1

STATEMENT OF FACTS ………………………………………………..………..… 1

STANDARD OF LAW ………………………………………………………….. 8

ARGUMENT ……………………………………………………………… 8

POINT I …………………………………………………………………….… 8

       Plaintiff's Substantive Due Process Claim states a viable claim for relief.

A. Plaintiff pleaded a viable claim for violation of his substantive
    due process rights. ................................................................................. 8

B. Plaintiff asserted the violation of fundamental rights requiring
    strict scrutiny analysis. ........................................................................ 9

    1. The failure to accommodate Plaintiff's medical condition
       violated his fundamental right to self-preservation and must
       be strictly scrutinized. ...................................................................... 9

    2. The right to refuse medicine – even lifesaving medicine –
       is now deemed fundamental and is also subject to strict
       scrutiny. ......................................................................................... 10

C. Plaintiff's Substantive Due Process Claims Should Be Strictly
    Scrutinized but are Viable under any Standard of Review. ........................................ 11

    1. Strict scrutiny applies and Defendants cannot meet their
       burden under strict scrutiny. ...................................................................11

    2. Jacobson does not impose a lower standard of review. ........................................11

       a. This Circuit has abrogated the use of a lower *Jacobson* test. .................12

       b. A recent Ninth Circuit case held Jacobson exception does
          not apply to Covid-19 vaccine mandates on a motion to
          dismiss where Plaintiff alleges the vaccine was only
          designed for personal protection. ............................................................ 12

c.   Jacobson does not apply to analysis of the sufficiency
of a medical exemption.  ....................................................................... 13

3.   Plaintiff pleaded viable claims even under the Jacobson test.  ........................ 13

4.   Under rational basis review, Plaintiff should also still
prevail because Defendants' medical exemption policies
were so reckless as to shock the conscience.  ................................................... 15

D.  The Unconstitutional Conditions Doctrine  ........................................................... 16

POINT II …………………………………………………………………………..... 17

Plaintiff's claims for failure to accommodate pursuant to
NYSHRL and NYCHRL state viable claims for relief.

A.  Plaintiff has a disability.  .....................................................................................18

B.  Defendants failed to accommodate Plaintiff's disability.  ................................. 21

POINT III………………………………………………………………..……..…..23

Plaintiff's NYCHRL failure to engage in a cooperative dialogue claim
states a viable claim for relief.

CONCLUSION …………………………………………………………………...….. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ……………....…….……….. 11

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) …………………………....…………. 8

*Black v. ESPN, Inc.*, 70 Misc. 3d 1217(A), 139 N.Y.S.3d 523 (Sup. Ct., N.Y. Cty. 2021) … 20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ……………....…..… 11

*Cole v. Uni-Marts, Inc.*, 88 F. Supp. 2d 67 (W.D.N.Y. 2000) ……………….........…….. 18

*Cooney v City of New York Dept. of Sanitation*, 127 A.D.3d 629 (1st Dep't 2015) …....….. 19

*Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88 (2d Cir. 2003) ……….........…..… 23

*Cruz v. Schriro*, 51 Misc. 3d 1203(A), 36 N.Y.S.3d 407 (Sup. Ct., N.Y. Cty. 2016) ……… 20, 23

*Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990) ………........……….. 10

*Doe v Bloomberg L.P.*, 36 NY3d 450 (2021) ………………………….......………….. 17

*Goldman v. Sol Goldman Invs. LLC*,
2022 U.S. Dist. LEXIS 175353 (S.D.N.Y. Sept. 27, 2022) ……….........................………… 24

*Estate of Benitez v. City of New York*, 193 A.D.3d 42 (1st Dep't 2021) ……..............…… 22

*Health Freedom Def. Fund v. Carvalho*, 104 F.4th 715 (9th Cir. 2024) ……........…….… 12

*Heiden v. NYC Health & Hosps. Corp.*,
2023 U.S. Dist. LEXIS 5583 (S.D.N.Y. Jan. 11, 2023) ………………….................……….. 24

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) …...……………………....……. 9, 10, 13

*Jeffery v. City of New York*, 113 F.4th 176 (2d Cir. 2024) ………………………....…….. 11

*Koontz v. St. Johns River Water Mgmt Dist.*, 570 U.S. 595 (2013) ……………....……….. 15

*Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020) …………………....…………. 8

*McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92 (2d Cir. 2009) ……....….. 16

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir.2007) ……………………..… 8

*Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006) …......................…..……. 14

*Perry v. Sinderman*, 408 U.S. 593 (1972) ………………..............……………………….. 15

*Phillips v. City of N.Y.*, 884 N.Y.S.2d 369 (1st Dep't 2009) …………......…………….. 17, 24

*Reed v. Nike, Inc.*, 2019 WL 2327519 (S.D.N.Y. May 31, 2019) ……...........................…… 23

*Rochin v. California*, 342 U.S. 165 (1952) …………….....................................…. 15

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct 63 (2020) ………………… 11, 16

*Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881 (NY 2013) …………................……. 22

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) …………….......…………….. 11

*Sell v. United States*, 539 U.S. 166 (2003) ………………………….........………….. 13

*Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778 (S.D.N.Y. 2020) ……..............................…… 16, 24

*Spiegel v. Schulmann,* 604 F.3d 72 (2d Cir. 2010) ………………................……………. 18

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) …………….....……………. 11

*Turney v. Safley*, 482 U.S. 78 (1987) …………………………………….......…………. 13

*Wagner v. County of Nassau*, 2014 WL 3489747 (E.D.N.Y. July 11, 2014) …........……. 20

*Warmsley v. NYC Transit Auth.*, 308 F. Supp. 2d 114 (E.D.N.Y. 2004) ………........……. 20

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ………………………...……………. 10

*Washington v. Harper*, 494 U.S. 210 (1990) ………………………………….........…. 13

**Statutes**

Local Civil Rights Restoration Act of 2005, §1 ………..............................……….. 17

**Page(s)**

MODEL PENAL CODE 3.04 ……………….................................……..……….. 9

N.Y. Executive Law § 292 …………................................….................................…… 17

N.Y. Executive Law § 296 ……………….................................….......................…….. 17

N.Y. PENAL LAW 35.15 ……………………......................................………………..9

N.Y.C. Admin. Code § 8-102 ……………….................................………….. 18, 19

N.Y.C. Admin. Code § 8–107 ………..................................................……………... 17

N.Y.C. Admin. Code § 8-130 ……………….................................................…….. 17

**Other Authorities**

1 W. BLACKSTONE COMMENTARITES ……………………….............…………….. 9

A.J. Ashworth, SELF-DEFENCE AND THE RIGHT TO LIFE,
34 Cambridge L.J. 282 (1975) …………………………………………...........……. 9

JOHN LOCKE, SECOND TREATISE OF GOVERNMENT (1690) ………...............…9

LAWRENCE O. GOSTIN,
PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28 (2d ed. 2008) ….......... 14

## PRELIMINARY STATEMENT

This case presents stark constitutional violation that transcends mere statutory claims. While Plaintiff's allegations give rise to claims under NYSHRL and NYCHRL, they also reveal a profound violation of Pastrana's substantive due process rights—rights deeply rooted in our nation's history and traditions.

The Constitution has long safeguarded individuals from government-coerced medical procedures, particularly when those procedures threaten serious harm. Shockingly, despite having undeniable documentation of Pastrana's life-threatening anaphylactic reaction to the first vaccine dose, the City enforced its mandate with inexplicable rigidity and refused to allow him to decline the second dose, even though he was contraindicated under every standard of care. Facing termination, Pastrana was forced to choose between his career and his health—a choice no American should face. (FAC ¶¶ 98-99).

The consequences were devastating and permanent: myocarditis, chronic disability, and the end of Pastrana's firefighting career. (FAC ¶¶ 104, 110-114, 123). This was not a case where accommodation would have endangered public health—the City already allowed 1,176 firefighters to work unvaccinated while their religious accommodation requests were pending. (FAC ¶ 44). Pastrana sought nothing more than an individualized assessment based on his documented medical reality. What he received instead was the unconscionable violation of his most fundamental right: the right to refuse a medical treatment that physicians knew could—and did—cause him grievous harm.

## STATEMENT OF FACTS

Plaintiff Obrian Pastrana is a lifelong New Yorker, a husband, father, and career firefighter who served the City with honor and distinction until the second dose of the Covid-19 vaccine

nearly killed him and rendered him permanently disabled. (FAC ¶ 1).

**The Vaccine Mandate**

On October 20, 2021, the New York City Commissioner of Health and Mental Hygiene issued the City Worker COVID-19 Vaccine Mandate ("Vaccine Mandate"). (FAC ¶ 24). The Vaccine Mandate required City employees, including the Plaintiff, to provide proof that they had been fully vaccinated against COVID-19 or they had received the first dose of a two-dose COVID-19 vaccine. (FAC ¶ 25). The Vaccine Mandate defined "fully vaccinated" as "at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine as approved or authorized for use by the Food and Drug Administration or World Health Organization." (FAC ¶ 26).

The City promulgated a written policy regarding the implementation of the Vaccine Mandate and the reasonable accommodation process. (FAC ¶ 33). This policy, entitled "FAQ on New York City Employees Vaccine Mandate" provided for religious and medical accommodation and stated the alternative to vaccination allowed which would not cause an undue hardship if an employee is granted a reasonable accommodation would be submission of a weekly negative test result. (FAC ¶ 35). The policy also provided for medical accommodations, and permanent medical accommodations were provided for employees who had a documented contraindication such that an employee could not receive any FDA-authorized vaccines, with contraindications delineated in CDC clinical considerations for COVID-19 vaccine. (FAC ¶ 36-37). The Defendants granted firefighters similarly situated to Plaintiff both religious and medical accommodations and allowed them to continue working unvaccinated. (FAC ¶ 41-42). The City's policy also provided that employees who requested reasonable accommodations would continue working and submitting

weekly negative test results while their accommodation request was pending. (FAC ¶43). Due to administrative constraints and backlog, thousands of City employees, including many FDNY employees (and FDNY firefighters), continued working unvaccinated for for the entirety of the imposition of the Mandate, and some of them were never placed on LWOP nor were they ever terminated, and instead continued to submit to weekly testing until the Vaccine Mandate was eventually lifted. (FAC ¶44). During this time, the City had mutual aid agreements with outside municipalities that did not have vaccination requirements and/or provided first responders to work unvaccinated with reasonable accommodation. (FAC ¶ 31). The City also had volunteer Fire Departments who were not subject to the Vaccine Mandate or any vaccination requirement. The volunteer firefighters and personnel were permitted to work unvaccinated. (FAC ¶ 32).

**The COVID-19 Vaccines Do Not Prevent Transmission**

Covid-19 vaccines are unusual in that they do not prevent infection or transmission of the COVID-19 virus, but were developed and tested for their efficacy in potentially reducing personal symptoms. (FAC ¶ 48). This was known when the mandate was imposed. On July 27, 2021—months before the Mandate was implemented—the Centers for Disease Control and Prevention ("CDC") issued guidance stating that "[v]accinated people can still become infected and spread the virus to others." (FAC ¶ 49). CDC Director Rochelle Walensky admitted that the COVID vaccines "can't do anymore is prevent transmission." (FAC ¶ 50). On July 30, 2021, Director Walensky issued a public statement acknowledging that "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people," indicating that "unlike with other variants, vaccinated people infected with Delta can transmit the virus." (FAC ¶ 51). The CDC explicitly acknowledged that "anyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others" and that the vaccinated and

unvaccinated are equally likely to spread the virus. (FAC ¶¶ 52-53). In or around 2021, the CDC also changed the definition of "vaccine" from: "The act of introducing a vaccine into the body to produce immunity to a specific disease" (FAC ¶57) to: "The act of introducing a vaccine into the body to produce immunity to *protection from* a specific disease." (FAC ¶59). In other words, the CDC eliminated the word "immunity" from its definitions of "Vaccine" and "Vaccination," because it recognizes that the COVID Vaccines do not produce immunity to COVID-19. (FAC ¶60).

**The COVID-19 Vaccines Can Cause Harm**

Covid-19 vaccines can pose a significant health risk to recipients. (FAC ¶63). The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the COVID vaccines than with prior vaccines. (FAC ¶64). The COVID-19 vaccines can cause cardiac conditions, including inflammation of the heart and myocarditis, recognized by the CDC. (FAC ¶65). They can also lead to death.

**Plaintiff's Medical Condition and the City's Failure to Accommodate**

On October 29, 2021, in compliance with the City's COVID-19 Vaccine Mandate, Pastrana received the first dose of the Pfizer vaccine. (FAC ¶¶ 70–72). Almost immediately, he developed hives, swelling of his lips and face, chills, sweats, and body aches. (FAC ¶ 73). The symptoms worsened each day, spreading to his nose and face, with no relief from over-the-counter medications. (FAC ¶ 73). He was evaluated by doctors at the FDNY Bureau of Health Services ("BHS") and put on medical leave. (FAC ¶ 74). He told the FDNY doctor that he was afraid to get the second dose due to his apparent allergic reaction and was told that he must receive the second dose to continue his employment. (FAC ¶ 75).

He continued to experience persistent symptoms including hives, significant swelling of his lips, face, and nose, as well as sweats, chills, and body aches. (FAC ¶ 78). On November 15, 2021, while working at the firehouse, Pastrana's condition became so severe that he was rushed to the hospital by ambulance. (FAC ¶ 79). He was treated intravenously, administered epinephrine in the emergency room, and prescribed prednisone and an EpiPen for what was determined to be a vaccine-related allergic reaction. (FAC ¶ 79). He was immediately placed on medical leave by the FDNY. (FAC ¶ 80). He never returned to active duty. (FAC ¶ 80).

Plaintiff was seen again by FDNY BHS on November 16, 2021, and again expressed his concerns about receiving the second dose due to his ongoing severe and pervasive allergic reaction, and asked for a medical accommodation. (FAC ¶ 81). The FDNY doctor told him that he must receive the second dose to continue working, and that the only way to qualify for a medical accommodation was to provide allergy test results demonstrating an allergy to the vaccine. (FAC ¶ 81-83).

He had to take prednisone to keep his symptoms at bay. (FAC ¶ 84). Even while on prednisone, his symptoms persisted—shortness of breath, swelling, and hives. (FAC ¶ 84). When he discontinued the medication, his condition deteriorated again, and he was taken to the emergency room on November 21, 2021, where he was diagnosed with "worse shortness of breath and hives," and "anaphylaxis". (FAC ¶¶ 85–86).

The Defendants admit that it required laboratory allergy test results to be considered for a medical accommodation to the Vaccine Mandate. Def. Mem. of Law, p. 17-19 (describing such test results as "necessary"); *see also* FAC ¶ 83, 96. This rigid, medically unjustified demand ignored the obvious: FDNY was already on notice of Plaintiff's condition and his ongoing allergic reaction. (FAC ¶¶ 74-56, 79, 81-83).

In fact, the FDNY Chief Medical Officer and Three Physician Board diagnosed Plaintiff with an allergic reaction to the COVID vaccine and confirmed in their report that Plaintiff had suffered an allergic reaction to the first vaccine dose, and that the allergic reaction "worsened" after the second dose. Attached hereto as **Exhibit 1** is the February 28, 2023 report from the FDNY Medical Committee, authored by the Chief Medical Officer and Three Physician Board, which is expressly referenced in the First Amended Complaint at paragraph 113 and therefore properly considered on this motion.

Despite the fact that Pastrana had put the FDNY on notice of his ongoing allergic reaction, which was the *only* CDC-delineated contraindication to receiving the vaccine (FAC ¶ 77), and requested to be accommodated, Defendants failed to accommodate him. (FAC ¶¶ 74, 83, 96, 114). According to Plaintiff's allergist, he could not safely undergo allergy testing while taking prednisone, which remained medically necessary to manage his symptoms. (FAC ¶ 87). Pastrana was never offered any accommodation—not even the weekly PCR testing that had been extended to other firefighters with medical accommodations. (FAC ¶¶ 89–95, 160, 169–172).

Instead, he was placed in an impossible position: receive a second dose of the vaccine, despite a CDC-recognized contraindication and multiple hospitalizations—or be terminated. (FAC ¶¶ 98–99). Fearful of losing his career and income, Pastrana submitted to the second dose on November 23, 2021, against his will. (FAC ¶ 99). It was not a medical decision—it was coercion under threat of job loss. (FAC ¶ 99).

After the second dose, his condition worsened further. He suffered shortness of breath, hives, chest pain, reduced oxygen levels, and ultimately heart failure and myocarditis, serious cardiac conditions. (FAC ¶¶ 100, 103–104, 197). FDNY determined that he was permanently unfit for duty and initiated forced retirement proceedings. (FAC ¶¶ 110–114). The City's response to

his adverse reaction was not accommodation or dialogue—it was a Hobson's choice between vaccinate-or-terminate. To add insult to injury, in a tie vote (with all union officials voting in favor, and all City officials voting against), Plaintiff was denied Accidental Disability Benefits, leaving him with Ordinary Disability Benefits, which provide barely enough to keep food on the table. (FAC ¶¶ 116-120).

To this day, Plaintiff physically suffers from permanent cardiovascular disability, chronic fatigue, trouble breathing, chest pain, loss of energy, shortness of breath, and small fiber neuropathy. (FAC ¶ 123). He cannot walk more than short distances. He must be on medication for the long-term for heart failure, pain, and to keep hives at bay. (FAC ¶ 123). He also has to carry around an inhaler (Albuterol) and an EpiPen. (FAC ¶ 123).

Personally, his family life is also suffering. (FAC ¶ 124). He cannot play catch with his young daughter anymore. (FAC ¶ 124). He cannot help his wife around the house. He cannot afford to make mortgage payments or afford basic necessities due to the loss of income being on ordinary disability. (FAC ¶ 124). He continues to struggle with immense loss over his career as a firefighter, his health, longevity of life, being physically able-bodied, and never having complete heart function again. (FAC ¶ 124).

Plaintiff also suffers from depression and anxiety. (FAC ¶ 122). He regularly receives ongoing mental health treatment from a specialist. (FAC ¶ 122). He has been diagnosed with ongoing posttraumatic stress disorder, and adjustment disorder with depressed mood. (FAC ¶ 122). He deals with frustration, intrusive thoughts, sadness, anger, grief, self-doubt, guilt, loss, regret, feels invisible, and is completely devastated by what has happened to him. (FAC ¶ 122).

Plaintiff brought an Article 78 proceeding against the New York City Fire Pension Fund, challenging the denial of Accidental Disability Retirement benefits. (FAC ¶ 121). The Supreme

Court in New York County denied the petition, on the basis that Plaintiff's vaccine injury was incidental – not accidental – and that it arose out of his performance of routine duties, receiving the COVID-19 vaccine, not as a result of an unexpected event, as required to meet the definition of accident under the New York City Administrative Code. *Pastrana v. New York City Fire Pension Fund, et. al.*, Index No. 160515/2023 (Sup Ct., New York Cnty, April 3, 2023). This Court is the Plaintiff's only hope for some semblance of justice.

## STANDARD OF LAW

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the Complaint are accepted as true, and all reasonable inferences must be drawn in the Plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). The Court should not dismiss the Complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). A plaintiff is not required "to plead a *prima facie* case", but to "assert [enough] nonconclusory factual matter ... to nudge [her] claim[ ] across the line from conceivable to plausible to proceed." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208–09 (2d Cir. 2020).

## ARGUMENT

**POINT I**: **Plaintiff's Substantive Due Process Claim states a viable claim for relief.**
  A. **Plaintiff pleaded a viable claim for violation of his substantive due process rights**.

Defendants argue that Plaintiff's substantive due process claim fails because the Vaccine Mandate does not implicate any fundamental rights and does not shock the conscience. This mischaracterizes both the nature of Plaintiff's claim and the applicable constitutional standard. Plaintiff does not challenge the facial validity of the Vaccine Mandate but rather challenges the City's narrow medical accommodation policy and its application to him—a firefighter who suffered a documented severe allergic reaction to the first dose of the COVID-19 vaccine,

including anaphylaxis, a known contraindication for subsequent doses per CDC guidelines. He asserts that the City's policy of denying medical accommodation unless an employee showed laboratory proof of allergy to a component of the vaccine was unconstitutional as applied to him, because it was too narrow to accommodate his fundamental rights to protect himself from likely harm and to refuse medicine generally.

**B. Plaintiff asserts violations of fundamental rights requiring strict scrutiny analysis.**

**1. The failure to accommodate Plaintiff's medical condition violated his fundamental right to self-preservation and must be strictly scrutinized.**

Plaintiff has a fundamental right to a medical exemption from a government mandate that places him at risk of harm. At its core, the right to a medical exemption when a person is at risk of serious harm derives from the natural right to self-preservation—a right deeply rooted in our nation's history and traditions. This right to protect oneself from harm is considered antecedent to the validity of any governmental system. *See, e.g.,* A.J. Ashworth, SELF-DEFENCE AND THE RIGHT TO LIFE, 34 Cambridge L.J. 282 (1975).

The right to self-defense is not merely a liberty interest but a natural right recognized by foundational political philosophers. As William Blackstone described the right to protect one's "life and limb" from harm is "the primary law of nature," holding that it is an "absolute right" which "every man has a right to enjoy." 1 W. BLACKSTONE COMMENTARITES. John Locke similarly described self-preservation as being so fundamental that "no law can oblige a man to abandon it." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT (1690).

This right is so deeply rooted that it forms the basis for general exceptions to nearly all laws, even criminal laws, including laws against homicide, assault, and weapon possession. *See, e.g.,* N.Y. PENAL LAW 35.15(2)(a)-(b); MODEL PENAL CODE 3.04 cmt. 4(a). If a person is allowed to be exempt from laws criminalizing murder based on this right, it is incomprehensible that a

firefighter cannot be accommodated from a second vaccine dose of a non-sterilizing vaccine after nearly dying from the first, especially when CDC guidance indicates contraindication.

In fact, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which Defendants rely on, explicitly supports this right. The Court cautioned that while state police power can override nonspecific liberty interests during a pandemic, it "must always yield in case of conflict with...any right which [the Constitution] gives or secures." *Id*. at 25. The Court specifically recognized a right to medical exemption as the primary constitutional right which the police powers could not override, emphasizing that if it were "apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination or that vaccination, by reason of his then condition, would seriously impair his health or probably cause his death," enforcing the mandate would be not only unconstitutional but also "cruel and inhuman in the last degree." *Id*. at 39.

Here, Plaintiff's condition falls squarely within this protected category. Pastrana suffered a life-threatening anaphylactic response to the first dose that required emergency medical intervention, including epinephrine administration and repeated hospitalization. It was apparent he was not a fit subject for the second dose. The CDC explicitly recognizes "severe allergic reaction after a previous dose" as a contraindication to vaccination.

## 2. The right to refuse medicine is now deemed fundamental and is also subject to strict scrutiny.

Supreme Court precedent has evolved significantly since 1905. The Court now expressly recognizes a fundamental right to refuse medical intervention, even lifesaving medical intervention. This right was first explicitly recognized in *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990), wherein the Court recognized a due process liberty interest in refusing unwanted medical treatment based on the doctrine of informed consent and the common-law rule that forced medication equals battery. In recognizing this right, the Supreme Court noted,

"no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." *Id*. at 269. Later Supreme Court jurisprudence confirms that "There is no question that the right [to refuse medical intervention] is fundamental." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

**C. Plaintiff's Substantive Due Process Claims Should Be Strictly Scrutinized but are Viable under any Standard of Review.**

**1. Strict scrutiny applies and Defendants cannot meet their burden under strict scrutiny.**

"When a constitutional challenge triggers heightened scrutiny—as here—dismissal will rarely be appropriate at pleading stage." *Jeffery v. City of New York*, 113 F.4th 176, 188 (2d Cir. 2024). Strict scrutiny requires the government to prove that its policy is the "least restrictive means" of achieving a compelling objective. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Defendants' medical exemption policy does not meet this burden. Many less restrictive alternatives existed, such as allowing Pastrana to opt out just as the City allowed 1,176 firefighters to work unvaccinated during accommodation request processing.

**2. Jacobson does not impose a lower standard of review.**

Defendants do not attempt to justify their arbitrary medical accommodation policy under strict scrutiny but instead argue that Jacobson allows the Court to deviate from strict scrutiny, even in cases where the state has infringed a fundamental right, so long as the state passed a regulation for the "common good." [Def. Br. at 12]. But Jacobson predates judicially established tripartite nuanced tiers of scrutiny. Under those tiers, if the right infringed is fundamental or the law relies upon a suspect classification, strict scrutiny is applied. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Under that standard, a law is upheld only if it is narrowly tailored to a "compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

### a. This Circuit abrogated the use of a lower *Jacobson* test.

The Supreme Court and Second Circuit have abrogated applying a lower standard based on *Jacobson. See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct 63 (2020); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020). The Second Circuit explicitly stated:

> "[R]eliance on Jacobson was misplaced. In Jacobson, the Supreme Court upheld a mandatory vaccination law against a substantive due process challenge. Jacobson predated the modern constitutional jurisprudence of tiers of scrutiny…Indeed, the Jacobson Court itself specifically noted that 'even if based on the acknowledged police powers of a state,' a public-health measure 'must always yield in case of conflict with ... any right which [the Constitution] gives or secures.'" 983 F.3d at 635.

### b. The Jacobson exception does not apply to COVID-19 vaccines that only reduce symptoms.

The state cannot compel medical intervention absent strict scrutiny when the intervention is solely for the recipient's benefit. The Ninth Circuit's recent decision in *Health Freedom Def. Fund v. Carvalho*, 104 F.4th 715, 727 (9th Cir. 2024) recognized a significant distinction between vaccines that prevent transmission and those that primarily benefit the recipient. Jacobson's deferential standard was predicated on the vaccine's ability to prevent transmission, thereby protecting the public and triggering police powers. However, "Jacobson did not involve a claim in which the compelled vaccine was 'designed to reduce symptoms in the infected vaccine recipient rather than to prevent transmission and infection.'" *Id.* In such cases, the state's police powers do not govern, because the intervention is not for the "common" good.

Plaintiff here alleges that the COVID-19 vaccine was not designed to prevent transmission but rather to reduce symptoms in infected individuals. The Amended Complaint specifically

alleges that the government admitted the vaccines did not stop transmission prior to the Mandate's imposition. When a vaccine primarily benefits the recipient rather than preventing transmission, the state's power must be analyzed under the framework governing other medical interventions, where strict scrutiny applies.

### c. *Jacobson* does not apply to medical exemption cases.

Even if *Jacobson* applies a lower standard to general liberty interests, it still requires strict scrutiny for medical exemptions, as the Court itself stated in *Jacobson*: "We are not to be understood as holding that the statute was to be applied in such a case [where vaccination would impair health], or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned." *Jacobson*, 197 U.S. at 39.

### 3. Plaintiff pleaded viable claims even under the Jacobson test.

Moreover, Plaintiff's claims are still viable under the *Jacobson* test. This is, essentially, the same test applied in prison settings, where, for similar reasons, the Court holds that fundamental rights may be reviewed under a lesser burden inquiring whether the infringement "is a reasonably related to penological interests." *Turney v. Safley*, 482 U.S. 78 (1987). As the prison cases show, the rational basis test is not a toothless standard where the right to refuse medicine is invoked. In such cases, the review requires more robust analysis than in cases where the nature of the right is not as substantial. In *Washington v. Harper*, 494 U.S. 210 (1990), the Court recognized that even in the prison context, "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id*. at 229. The Court further noted that while the State might have an interest in reducing the danger that such inmates pose to himself or others (*see id.* at 236), "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229. In so holding, the Court

recognized that outside of prison, this right would be analyzed under strict scrutiny. *Id.* at 223. But even under the lesser prison standards, the Court still required robust individualized review.

More recently, in *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court articulated an even more rigorous four-part test that must be applied today in the assessment of a prison's infringement on the right to refuse medicine, and arguably should be applied here if *Jacobson* is used to deviate from strict scrutiny.  In *Sell*, the Court held that such infringement on liberty can occur only if four elements are proven: (1) "important governmental interests are at stake," to be evaluated based on the "facts of the individual case"; (2) "the involuntary medication will significantly further" those interests; (3) "the involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate, i.e., in the patient's best interest in light of his medical condition." 539 U.S. at 180-181 (all italics in the original). The ultimate test is this: "Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Id*. at 183 (italics added); *see also Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006) *(*simplifying the test to a balancing test, holding "a prisoner's right to refuse medical treatment need not be honored if legitimate penological interests require the prisoner to be treated.")

Under this test, Pastrana has clearly articulated a claim. Defendants offer no reasonable explanation for the denial, only a rigid, arbitrary requirement unrelated to public health. Forcing Pastrana to take the contraindicated second dose failed all prongs: the vaccine could not further public health interests because it could not stop transmission; allowing his exemption would not significantly hamper any effort; it was unnecessary given that 1,176 firefighters worked

unvaccinated; and administration was not in Pastrana's best interest, as CDC guidance explicitly contraindicated further doses due to his anaphylaxis.

Alternatively, Plaintiff offers the test set forth in *Jacobson* itself. Public health scholars recognize five elements to be constitutional: (1) public health necessity; (2) reasonable means; (3) proportionality; (4) harm avoidance, and (5) fairness. *See, e.g.,* LAWRENCE O. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28 (2d ed. 2008). Defendants' medical exemption policy, at least as applied to Pastrana, cannot meet these prerequisites. It is patently unfair and violates principles of harm avoidance to require an employee to choose between his job and a vaccine which is contraindicated for him under government regulations due to his underlying condition and injury from the first dose. Nor is it proportional or necessary to ask this of him, given the multiple carve outs and official recognition that the vaccine is only for personal protection.

### 4. Under rational basis review, Plaintiff should also still prevail.

Defendants' reasoning for denying accommodation to Pastrana is so arbitrary, reckless and cruel that it shocks the conscience. The Catch-22 situation—where Plaintiff could not obtain the required proof because he was being treated for the severe reaction—demonstrates the arbitrary nature of Defendants' policy. Equally shocking, Defendants argue that Plaintiff's severe allergic reaction and anaphylaxis were merely "temporary conditions" not deserving protection or accommodation. This reveals the callous and inhuman nature of their approach: they created a system where life-threatening reactions to the first dose were deemed insufficient grounds for accommodation from the second dose. This position ignores that a "temporary" anaphylactic reaction can permanently end a person's life if they are forced to receive a second dose, as recognized by CDC guidelines. Under such policies, tragedies like the one Pastrana suffered were not just a possibility, they were an inevitability.

Defendants' own arguments illustrate why Pastrana's constitutional claims are viable: when statutory protections prove inadequate, as Defendants argue is the case here, constitutional protections must fill the gap to prevent government actions that "shock the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952). This case is such a case. Pastrana was a team player, and all he asked for was a reasonable medical accommodation in accordance with all of the medical literature. Instead, without any rational basis, the City forced him to submit to a second dose, even though it was highly likely he would be severely injured and killed, and now he is disabled for life and unable to provide for or care for his family. This shocks the conscience.

### D. The Unconstitutional Conditions Doctrine

To the extent that Defendants argue they merely conditioned employment on compliance, this argument fails. "Even though a person has no 'right' to a valuable government benefit... [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972). The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt Dist*., 570 U.S. 595, 604 (2013).

The Hobson's choice imposed on Pastrana also violates *Jacobson's* proportionality requirement. In the concurring opinion in *Roman Catholic Diocese of Brooklyn,* Justice Gorsuch pointed out that *Jacobson's* continued viability hinges on the fact that the penalty for noncompliance was not overly coercive, and thus might pass muster under modern tiers of scrutiny, stating: "In *Jacobson*, individuals could accept the vaccine, pay the fine [$5], or identify a basis for [medical] exemption. 141 S.Ct. 63, 71 (2020) (Gorsuch J., concurring). The imposition on Mr. Jacobson's claimed right to bodily integrity, thus, was avoidable and relatively modest. It

easily survived rational basis review and might even have survived strict scrutiny, given the [medical exemption] opt-outs available." *Id.*

This point was embraced by the entire Court. "Tellingly, no Justice disputes these points." *Id.* Here, no such proportionality exists. The City inflexibly demanded that Pastrana take a contraindicated vaccine that would likely kill or seriously harm him or lose his entire career. Certainly, this is more coercive than a $5 fine, even adjusted for inflation, and it has none of the saving opt-outs recognized by the Supreme Court as vital to such an analysis.

**POINT II: Plaintiff's claims for failure to accommodate pursuant to NYSHRL and NYCHRL state viable claims for relief.**

To establish a *prima facie* claim for failure to accommodate under the NYSHRL and NYCHRL, "a plaintiff must make the following showing: (1) plaintiff is a person with a disability under the meaning of the [statute]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 790 (S.D.N.Y. 2020) (*citing McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009); *see* Executive Law § 296(3)(a); N.Y.C. Admin. Code § 8–107(1)(a); 15(a)-(b).

"[NYSHRL][1] provides protections broader than the [ADA], and [NYCHRL] is broader still." *Phillips v. City of N.Y.,* 884 N.Y.S.2d 369, 373 (1st Dep't 2009). The NYCHRL imposes "substantially broader" liability on employers than its state counterpart. *Doe v Bloomberg L.P.*, 36 NY3d 450, 462 (2021). Federal and state laws with similar wording serve as "a floor", not a

---

[1] Historically, the standards for recovery under the NYSHRL mirrored Title VII. However, a 2019 amendment to the NYSHRL directs courts to construe it liberally to achieve its remedial purposes, irrespective of how comparable federal laws have been interpreted. N.Y. Exec. Law § 300. This amendment aligns the NYSHRL more closely with the NYCHRL, which contains a similarly broad construction mandate. N.Y.C. Admin. Code § 8-130(a).

ceiling, for interpreting the NYCHRL. Local Civil Rights Restoration Act of 2005, §1. The NYCHRL commands that its provisions must be broadly construed for its remedial purposes, and "exceptions and exemptions…shall be construed narrowly in order to maximize deterrence of discriminatory conduct". N.Y.C. Admin. Code § 8-130 (a)-(b).

**A. Plaintiff has a disability.**

Plaintiff clearly pleaded a disability under the NYSHRL and NYCHRL. The NYSHRL defines "disability" broadly as "a physical, mental or medical impairment ... which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Executive Law § 292(21)(a). The NYCHRL defines disability even more broadly as "any physical, medical, mental or psychological impairment, or a history or record of such impairment", including "impairments of any system of the body; including but not limited to, respiratory organs,... speech organs; the cardiovascular system;  the hemic and lymphatic systems; the immunological systems; the skin..." New York City Admin. Code § 8-102.  Unlike the ADA, neither the NYSHRL nor the NYCHRL require that an impairment "limit a major life activity." *Cole v. Uni-Marts, Inc.*, 88 F. Supp. 2d 67, 73–74 (W.D.N.Y. 2000). As the Second Circuit has noted, the NYCHRL must be interpreted in light of its "uniquely broad and remedial purposes," which go beyond those of state and federal counterparts. *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010).

Plaintiff's allegations easily satisfy the definitions of disability under both the NYSHRL and NYCHRL. After receiving the COVID-19 vaccine, he immediately developed hives, facial swelling, chills, sweats, and body aches, which progressively worsened. FAC ¶73. Each day thereafter, he awoke with increased swelling of his lips, face, and nose, accompanied by persistent hives. *Id*. Over-the-counter medications provided no relief, and his symptoms

intensified. FAC ¶¶73, 78. While on duty, Plaintiff's condition deteriorated due to the worsening and severity of his allergic reaction, which included rash, hives, and swelling in the lips, to the point that he was taken by ambulance to the hospital for intravenous treatment, epinephrine administration, and was prescribed prednisone and an EpiPen. FAC ¶79. He was placed on medical leave and never returned to active duty. FAC ¶80.

Despite corticosteroid treatment, Plaintiff continued to suffer from shortness of breath, swelling, and hives. FAC ¶84. When he discontinued prednisone, his symptoms worsened, prompting another emergency room visit due to shortness of breath and a worsening of his swelling and hives, where he was again diagnosed with anaphylaxis. FAC ¶¶85–86. And this was all *before* the second dose. These conditions persisted even *after* the second vaccine dose, and he developed further complications including heart failure, myocarditis, chest pain, and decreased oxygen levels. FAC ¶¶ 100, 104, 197. Years later, he still suffers from shortness of breath and hives. FAC ¶123.

These symptoms impaired multiple systems explicitly listed in the NYCHRL: swelling of the lips and face implicates the speech organs; shortness of breath affects the respiratory and cardiovascular systems; systemic allergic and inflammatory reactions involve the hemic, lymphatic, and immunological systems; and persistent hives and swelling affect the skin. FAC ¶¶ 73–86, 100, 104, 123. These were not speculative complaints—they were documented through hospital records, emergency transport, physician treatment, and long-term medication. *Id.*

This places Plaintiff's impairment squarely within the NYCHRL's broad scope, which requires only a physical impairment of any system of the body. *See* N.Y.C. Admin. Code § 8-102. It also satisfies the NYSHRL's "normal bodily function" standard, as his ability to breathe,

regulate immune response, and maintain integumentary function was clearly impaired and "demonstrable by medically accepted clinical techniques." FAC ¶¶ 73–86.

Moreover, the condition was neither transient nor minor. Plaintiff required continuous steroid treatment, suffered relapse upon discontinuation, and was never medically cleared to return to work. FAC ¶¶ 80, 85. His symptoms emerged immediately after vaccination and steadily worsened, persisting to this day. FAC ¶¶ 73, 78–79, 123.

New York courts have consistently recognized that far less severe allergic reactions and skin conditions qualify as disabilities under these statutes. In *Cooney v City of New York Dept. of Sanitation*, 127 A.D.3d 629 (1st Dep't 2015), psoriasis on the hands was held to be a disability. In *Black v. ESPN, Inc.*, 70 Misc. 3d 1217(A), 139 N.Y.S.3d 523 (Sup. Ct., N.Y. Cty. 2021), environmental allergies causing intermittent respiratory and skin symptoms were held sufficient under the NYSHRL. Most directly on point, in *Cruz v. Schriro*, 51 Misc. 3d 1203(A), 36 N.Y.S.3d 407 (Sup. Ct., N.Y. Cty. 2016), found that recurring episodes of hives, swelling, and breathing difficulty—similar to those here—constituted a disability under both statutes, even where the cause of the allergic reaction was unclear. Plaintiff's condition was more severe and persistent than those at issue in *Cruz*, requiring emergency treatment, intravenous medication, and long-term corticosteroid therapy.

Even if Plaintiff's allegations were not enough—and they are—Defendants' own records confirm his disability. After suffering a severe allergic reaction to the first dose, Plaintiff was placed on medical leave (FAC ¶¶ 73–80), diagnosed by FDNY with a "COVID-19 vaccine side effect" (FAC ¶¶ 74, 84), and never returned to the firehouse before receiving the second dose. He was later found permanently unfit for duty by FDNY and awarded Ordinary Disability Retirement. FAC ¶¶ 110–114, 116, 129–134. As in *Wagner v. County of Nassau*, 2014 WL

3489747, at 6–7 (E.D.N.Y. July 11, 2014), an employer's own reference to an employee's condition as a "disability" and decision to bar the employee from returning to work raises, at minimum, a question of fact as to whether the employer regarded the employee as disabled. The FDNY's determination that Plaintiff was permanently unfit due to a service-connected reaction (FAC ¶ 133) demonstrates a substantial limitation on major life activities—including working—and even satisfies the standard under the ADA. *Warmsley v. NYC Transit Auth.*, 308 F. Supp. 2d 114, 121 (E.D.N.Y. 2004).

Finally, Plaintiff's allergic reaction aligns precisely with CDC guidance, which identifies a severe or immediate allergic reaction to a prior COVID-19 vaccine dose as the *only* recognized medical contraindication to further vaccination. FAC ¶77. If the Court were to hold that such a reaction does not constitute a disability under the HRLs, it would mean that individuals with the only medically recognized contraindication would have no right to seek an accommodation—gutting these protections in the very cases where they are most needed.

**B. Defendants failed to accommodate Plaintiff's disability.**

Defendants' contention that Plaintiff's failure to provide laboratory allergy test results excuses their refusal to accommodate him is both factually disingenuous and legally unsupportable. Plaintiff was suffering from an *active, ongoing allergic reaction* at the time of his request and was *medically unable* to undergo the requested testing. Plaintiff's allergist explained that testing could not be performed while he was taking prednisone, prescribed to control his severe allergic symptoms. FAC ¶¶ 84, 87. Defendants nonetheless conditioned any accommodation on producing this medically infeasible test—despite their own records confirming his allergic reaction—effectively making accommodation impossible. This is not just unreasonable—it is a *failure* to accommodate.

Defendants expressly concede in their motion that Plaintiff "did not submit the requested laboratory test results," which they describe as a "necessary" step for an exemption. *See* Def. MTD at 17, 19. This amounts to an admission that Defendants imposed a rigid, medically contraindicated requirement as a precondition for relief. That is a textbook example of unlawful inflexibility in the reasonable accommodation process.

Once an employer has notice of an employee's disability, it has an affirmative obligation to make reasonable accommodations. See *Estate of Benitez v. City of New York*, 193 A.D.3d 42, 47–48 (1st Dep't 2021) (citing *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885, 998 N.E.2d 1050, 1053 (NY 2013)). That principle applies with equal force here: Defendants were already on notice of Plaintiff's disabling allergic reaction, which was documented by FDNY physicians and confirmed through hospitalization, diagnosis, and ongoing treatment. FAC ¶¶ 74, 79–87, 110–114. Plaintiff's need for accommodation was both obvious and recognized by the CDC's own guidelines (FAC ¶77), which the City explicitly incorporated into its written policy. FAC ¶¶ 34-37.

Under the ADA, which sets the floor for broader protections under NYSHRL and NYCHRL, employers cannot demand unnecessary or overly burdensome documentation once disability is established. *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97–98 (2d Cir. 2003). Defendants' refusal to consider accommodation unless Plaintiff completed a medically impossible test—despite ample medical evidence already in their possession—demonstrates a clear violation.

Courts have long recognized that rigid, inflexible policies that prevent individualized assessment violate the NYSHRL and NYCHRL. In *Reed v. Nike, Inc.*, 2019 WL 2327519, at *3 (S.D.N.Y. May 31, 2019), the court held that an employer's refusal to consider accommodations

unless a particular condition was met—without considering whether that condition was feasible—constituted a denial of accommodation. And under the NYCHRL, the duty is even stronger. In *Cruz v. Schriro*, 2016 WL 1173184, at *7 (N.Y. Sup. Ct. Mar. 24, 2016), the court held that employers have an "independent, affirmative duty to investigate feasible accommodations". That duty includes making reasonable efforts to accommodate the employee's condition, especially when the disability is apparent and medical documentation is already available. FAC ¶¶ 74, 103–104, 113–114.

In fact, the accommodation Plaintiff sought—weekly PCR testing—was not speculative or burdensome. It was consistent with Defendants' own written policy and was provided to other firefighters with medical contraindications. FAC ¶¶ 95, 160, 169–172. Denying it to Plaintiff solely because he could not produce a lab test that his doctors said could not safely be performed is the very definition of inflexibility.

In sum, Plaintiff has more than plausibly alleged that Defendants denied him a reasonable accommodation. Their insistence on unattainable documentation during a documented medical crisis was not just unreasonable—it was the act of denial itself.

**POINT III:** **Plaintiff's NYCHRL failure to engage in a cooperative dialogue claim states a viable claim for relief.**

Defendants' claim that Plaintiff "cut off" the interactive process by failing to obtain an allergy test is legally and factually baseless. It was Defendants—not Plaintiff—who obstructed the cooperative dialogue by imposing an unattainable and medically contraindicated precondition to even consider his request for a medical accommodation. *See Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 794–95 (S.D.N.Y. 2020) (rejecting employer's claim that plaintiff caused the breakdown in the interactive process, holding that an employee may still prevail on a failure-to-accommodate claim where "the defendant's policies foreclosed the only reasonable

accommodation that could have assisted plaintiff," and where the defendant's conduct "effectively indicated that the [defendant] had no intention of engaging in the interactive process in good faith"). Plaintiff was in the midst of an ongoing, documented allergic reaction that made testing medically impossible. *See* FAC ¶¶ 84–87. His treating allergist explained that allergy testing could not be safely performed while he was on prednisone, which was prescribed to control his systemic symptoms. *Id.*

Rather than engage in any discussion, Defendants repeatedly told Plaintiff to get vaccinated or face termination—even though they were already on clear notice that he had a medically documented contraindication. FAC ¶¶ 89–90, 103–104. They made no attempt to explore his individual needs, consider weekly PCR testing (FAC ¶ 160), or identify any alternative accommodation. This falls far short of the NYCHRL's cooperative dialogue requirement, which mandates "good faith written or oral dialogue" about the individual's needs, potential accommodations, alternatives, and any difficulties posed. N.Y.C. Admin. Code § 8-102. Telling an employee to vaccinate or be fired is not a dialogue—it is an ultimatum.

Blanket policies cannot justify a refusal to consider reasonable accommodations. The *Phillips* court further made clear that employers "may not abrogate the requirements of the HRLs by carving out a category of employees who are not subject to an interactive process." *Phillips v. City of New York*, 66 A.D.3d 170, 177-78 (1st Dep't 2009)[2]. That is exactly what happened here.

By requiring a laboratory allergy test as a precondition, Defendants excluded an entire class of employees—those medically unable to obtain such testing—from the accommodation process entirely. FAC ¶¶ 87, 103–104. Defendants ignored Plaintiff's treatment, declined to assess whether weekly testing was reasonable (despite offering it to others, FAC ¶¶ 160, 171–

---

[2] *Phillips* predates the NYCHRL's cooperative dialogue statute and analyzes the less-protective NYSHRL interactive dialogue requirement, which sets the floor below which the NYCHRL cannot fall.

172), and treated the absence of lab results as a categorical disqualifier. This rigid, one-size-fits-all policy is precisely the kind of gatekeeping *Phillips* condemns. This was not a breakdown in dialogue—it was a wholesale denial of it. Under the NYCHRL's broad protections, such conduct is not permitted.

Courts in this District routinely reject similar tactics. In *Goldman v. Sol Goldman Invs. LLC*, 2022 U.S. Dist. LEXIS 175353, at 12–13 (S.D.N.Y. Sept. 27, 2022), the court found no cooperative dialogue where the employer failed to discuss specific accommodation needs and relied solely on generalized COVID-19 policies. Likewise, in *Heiden v. NYC Health & Hosps. Corp.*, 2023 U.S. Dist. LEXIS 5583, at 111 (S.D.N.Y. Jan. 11, 2023), the court found no meaningful dialogue where the employer processed a request form and issued a denial without any substantive discussion.

Plaintiff has more than plausibly alleged that Defendants failed to engage in a cooperative dialogue in good faith. Their own records, actions, and policies confirm as much.

## CONCLUSION

Defendants' motion to dismiss should be denied.


Dated: Staten Island, New York
      April 15, 2025

Respectfully submitted,

_____
Christina Martinez, Esq.
Law Offices of Christina M. Martinez
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

*Attorneys for Plaintiff*