| | |
|---|---|
| OBRIAN PASTRANA<br><br>       *Plaintiff,*<br><br>   v.<br><br>NEW YORK CITY FIRE DEPARTMENT,<br>NEW YORK CITY DEPARTMENT OF<br>HEALTH AND MENTAL HYGIENE, and<br>CITY OF NEW YORK,<br><br>       *Defendants.* | **Case No. 1:24-cv-07348** |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff by his undersigned counsel, respectfully submits the following statement of material facts as to which there is no genuine issue to be tried.

**Plaintiff's Employment with FDNY**

1.      Plaintiff was employed by the New York City Fire Department ("FDNY"). (Ex. 16, State Court Verified Answer, ¶2).

2.      Plaintiff started his employment with the FDNY at 20 years old in 2006. (Pl. Decl. ¶4).

**The City's COVID-19 Vaccine Mandate**

3.      On October 20, 2021, the New York City Commissioner of Health and Mental Hygiene issued the City Worker COVID-19 Vaccine Mandate, an Order requiring all City Workers, including Plaintiff, to receive a COVID-19 vaccine by October 29, 2021 (hereinafter "Vaccine Mandate"). (Ex. 15, Vaccine Mandate).

4.      The Vaccine Mandate required City employees, including the Plaintiff, to provide proof that they had been fully vaccinated against COVID-19 or they had received the first dose of a two-dose COVID-19 vaccine. (Ex. 15, Vaccine Mandate at p. 4).

5.      The Vaccine Mandate defined "fully vaccinated" as "at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine as approved or authorized for use by the Food and Drug Administration or World Health Organization." (Ex. 15, Vaccine Mandate at p. 4).

6.      The Vaccine Mandate was a temporary work requirement which was lifted on February 9, 2023. (Ex. 17, Vaccine Mandate Amendment).

**Plaintiff's Allergic Reaction to the First Dose and Notice to FDNY**

7.       On October 29, 2021, in order to comply with the City's COVID-19 Vaccine Mandate, on the last day of the deadline, Plaintiff received the first dose of the Pfizer vaccine. (Pl. Decl. ¶5-7; see Ex. 1, Fire Commissioner's Application, p. 1).

8.      Plaintiff received the COVID-19 vaccine as a condition of his employment with the FDNY. (Ex, 16, State Court Verified Answer, ¶8).

9.      Soon thereafter, he developed chills, sweats, body aches, arm soreness, hives, and swelling in his lips. (Pl. Decl. ¶8; Ex. 1, Fire Commissioner's Application, p. 1; Ex. 6, BHS Examination Reports, p. 3).

10.      On October 30, 2021, Plaintiff called the FDNY Bureau of Health Services sick leave desk and reported that he needed medical leave. (Pl. Decl. ¶9).

11.      The FDNY Bureau of Health Services ("BHS") conducts annual monitoring physical examinations for FDNY firefighters. BHS also has a medical clinic that is staffed with medical officers who make determinations about FDNY firefighters placed on medical leave. When an FDNY firefighter is placed on medical leave, they are given a date to visit the BHS clinic

for duty determination and preauthorization of care outside of the FDNY. (Ex. 16, State Court Verified Answer, ¶59).

12. Due to Plaintiff's reaction to the COVID-19 vaccine, FDNY placed Plaintiff on medical leave from October 30, 2021 to November 2, 2021. (Ex 2, BHS MD-9 Summary, p. 4; Pl. Decl. ¶10).

13. The FDNY required Plaintiff to report to BHS for evaluation on November 1, 2021. (Pl. Decl. ¶11).

14. On November 1, 2021, Plaintiff presented to the FDNY BHS and was evaluated by Dr. Barbara Cheung, who diagnosed Plaintiff with "COVID-19 vaccine side effect", which she designated as "SC" (Service-Connected). (Ex. 2, BHS MD-9 Summary, p. 4; Pl. Decl. ¶12).

15. Plaintiff told Dr. Cheung that he had received the COVID-19 vaccine and that the vaccine was causing chills, sweats, body aches, localized pain to the injection site, swelling in his lips, and hives on his head. (Pl. Decl. ¶13; Ex. 1, Fire Commissioner's Application, p. 1).

16. Plaintiff told Dr. Cheung that he was treating these symptoms with over-the-counter medication. (Pl. Decl. ¶¶13-14).

17. Plaintiff told Dr. Cheung that he was afraid to get the second dose of the COVID-19 vaccine because of his allergic reaction to the first dose, and explicitly told her that he did not want the second dose because of what was happening to him. (Pl. Decl. ¶¶15-16).

18. Dr. Cheung dismissed his concerns and told him that he must get the second dose of COVID-19 vaccine and that he was required to be fully vaccinated to continue his employment with the FDNY. (Pl. Decl. ¶¶17-18).

19. His hives and swelling got worse each day, and over-the-counter medications were not controlling his symptoms. (Pl. Decl. ¶19).

20.     On November 7, 2021, Plaintiff's symptoms progressed to chest pains and shortness of breath. (Pl. Decl. ¶20).

21.     Between receiving his first and second doses of the COVID-19 vaccine, he experienced severe swelling and hives. On three separate nights during that period, he was abruptly awakened from sleep due to intense facial swelling and hives. The swelling affected his lips, face, and nose, and was so severe that he had shortness of breath. (Pl. Decl. ¶21).

22.     On November 15, 2021, on the third such occasion of abruptly waking in the middle of the night due to the swelling and hives, and seeing no relief despite consistently taking Benadryl, Zyrtec, and Claritin, he decided to see his primary care physician. (Pl. Decl. ¶22).

23.     That morning, on November 15, 2021, Plaintiff went to see his primary care doctor and reported his symptoms to her. She prescribed prednisone. (Pl. Decl. ¶23).

24.     Plaintiff went to work later that day. A few hours into his shift, while at the firehouse for duty, Plaintiff's supervisor was looking at him strangely and told him his face was swelling. (Pl. Decl. ¶24).

25.     Plaintiff's allergic reaction to the COVID-19 vaccine was worsening: The swelling that had been affecting his face and lips started spreading rapidly down the entire left side of his body—including his torso, leg, and foot. (Pl. Decl. ¶25).

26.     It became so alarming and severe that his supervisor, who witnessed the reaction, called an ambulance. (Pl. Decl. ¶26).

27.     Up to this point, this was one of the scariest moments Plaintiff has ever experienced. He knew something was seriously wrong and was terrified of what might happen if he received a second dose. (Pl. Decl. ¶27).

28. The ambulance arrived at the fire house and provided emergency treatment intravenously. (Pl. Decl. ¶28).

29. Plaintiff was taken by ambulance to the emergency room, where he was told that he was having a severe allergic reaction and was given epinephrine, a drug commonly used to treat anaphylaxis, along with prednisone. (Pl. Decl. ¶29; Ex. 3, New York Presbyterian After Visit Summary, November 15, 2021).

30. The next day, on November 16, 2021, Plaintiff reported to FDNY BHS for what is known as a "field visit," meaning it was considered a serious in-the-line-of-duty medical event. Field visits are not scheduled through the usual process—you skip the line and are seen immediately. (Pl. Decl. ¶30).

31. That day, on November 16, 2021, Plaintiff was evaluated at BHS by Dr. N. Chandswang. (Pl. Decl. ¶31).

32. During Plaintiff's visit, despite being treated the day before in the hospital, and being on prednisone, his lips were still swollen even as he presented to Dr. Chandswang. (Pl. Decl. ¶31; Ex. 6, BHS Examination Report, p. 31).

33. Plaintiff told Dr. Chandswang, explicitly and in detail, that his symptoms began after receiving the first dose of the COVID-19 vaccine and had become increasingly severe. (Pl. Decl. ¶32).

34. Plaintiff explained to Dr. Chandwang that this was the third time he had been woken up in the middle of the night due to severe swelling in his face, lips, mouth, and nose, and that during these events his "face didn't feel right"— Plaintiff could feel the swelling while he was asleep and it scared him. (Pl. Decl. ¶33).

35. Plaintiff explained to Dr. Changswang that he was particularly frightened because the swelling of his mouth made him worry that he might stop breathing, and that he was experiencing chest pain and shortness of breath. (Pl. Decl. ¶33).

36. Plaintiff told Dr. Chandwang that was why earlier the day before—before his shift on November 15—he had gone to see his primary care doctor. (Pl. Decl. ¶34).

37. Plaintiff explained to Dr. Chandwang what happened later that day on November 15, 2021, while on duty, how he was rushed to the hospital by ambulance due to the severity of the allergic reaction. (Pl. Decl. ¶34; Ex. 6, BHS Examination Report, p. 31).

38. Plaintiff also told Dr. Chandswang that Plaintiff was on prednisone. (Pl. Decl. ¶34; Ex. 6, BHS Examination Report, p. 31 ("given Benadryl and prescription for oral steroid and epi-pen)).

39. Plaintiff told Dr. Chandswang all of this, including that he was taking over-the-counter medications, including Benadryl, Zyrtec, and Claritin, but they weren't helping, and the reaction was getting worse. (Pl. Decl. ¶35; see Ex. 6, BHS Examination Report, p. 31).

40. Plaintiff told him plainly: this was a reaction to the vaccine, and that he could not get the second dose, and that he needed a medical exemption. (Pl. Decl. ¶36).

41. In response, Dr. Chandswang informed Plaintiff that the *only* way to qualify for a medical exemption was to undergo an allergy test that confirmed an allergy to the vaccine. (Pl. Decl. ¶37; *see* Ex. 6, BHS Examination Report, p. 31 ("f/u allergy test"); Whalan Aff. ¶¶13-15 (policy discussed in internal e-mails between firefighter and BHS Chief Medical Officer)).

42. Dr. Chandwang told Plaintiff that, without that test, he would be required to be fully vaccinated in order to continue working, despite the fact that he was still on prednisone and antihistamines for an active allergic reaction. (Pl. Decl. ¶37).

6

43.     Plaintiff was terrified, and knew that if he got the second dose, his reaction could become even more dangerous, but he was told by Dr. Chandswang that he had no choice. (Pl. Decl. ¶38).

44.     Dr. Chandswang informed Plaintiff that the FDNY would not permit any employee to forgo full vaccination or obtain a medical exemption without laboratory allergy test results confirming a vaccine allergy, and that no one would be excused from providing proof of a second dose absent such documentation. (Pl. Decl. ¶39; see Ex. 6, BHS Examination Report, p. 31 ("f/u allergy test")).

45.     Plaintiff was placed on medical leave by the FDNY from November 15, 2021 through November 22, 2021. (Pl. Decl. ¶42; Ex. 2, BHS MD-9 Summary, p. 4).

46.     Plaintiff continued taking the prednisone he was prescribed, but his symptoms were not going away; Even on prednisone, he was suffering from severe swelling of the head, face, mouth, nose, lips, as well as hives and shortness of breath. (Pl. Decl. ¶44).

47.     As soon as Plaintiff discontinued the prednisone, his symptoms became so severe he was again rushed to the emergency room on November 21, 2021, with worse shortness of breath, swelling, and hives. (Pl. Decl. ¶45; Ex. 4, Garnet Health Medical Center After Visit Summary, November 21, 2021; Ex. 1, Fire Commissioner's application).

48.     Plaintiff was diagnosed with anaphylaxis, and was again prescribed prednisone – this time for thirty days. (Pl. Decl. ¶45; Ex. 4, Garnet Health Medical Center After Visit Summary, November 21, 2021).

**FDNY's Refusal to Provide Reasonable Accommodation**

49.     The next day, on November 22, 2021, Plaintiff presented to Dr. Jinlin Du, an allergist at Crystal Run Healthcare and requested an allergy test. (Pl. Decl. ¶46).

50.     Dr. Du told Plaintiff that he could not perform an allergy test because Plaintiff was taking prednisone to treat his ongoing allergic reaction.  (Pl. Decl. ¶46).

51.     After meeting with Dr. Du, Plaintiff understood that he would not be able to undergo the required allergy testing due to his ongoing treatment with prednisone, and that without the test, he would not qualify for a medical exemption. (Pl. Decl. ¶¶47-49).

52.     "One of the conditions of employment to be a New York City firefighter is you have to follow orders. If you don't follow orders, then you are subjected to departmental charges. Well, in this case, this member followed the orders of his superiors, his superiors being actually officers, but more importantly, the Fire Department and the City of New York. They required him to take a vaccine, and if he didn't take the vaccine, the penalty was you're fired, so actually the firefighter has no other choice. He either has a job or he has to take the vaccine." (Ex. 8, Fire Pension Fund Board Meeting Minutes, p. 102:5-20).

53.     With no accommodation offered by the FDNY and allergy testing impossible for him to obtain, Plaintiff had no choice but to proceed with the second dose to avoid termination and to continue to be able to provide for his family. (Pl. Decl. ¶¶47-49).

54.     The Defendants required laboratory allergy test results to be considered for a medical accommodation to the Vaccine Mandate. (ECF Doc. No. 12-1, Def. Mem. of Law in Support of Def. Motion to Dismiss, p. 17-19 (describing such test results as "necessary"; Pl. Decl. ¶¶37; 39; *see* Whalan Aff. ¶¶13-15; Banome Decl. ¶¶12, 14; Fitzgerald Decl. ¶4).

55.     Plaintiff suffered from a severe allergic reaction to the first dose of the COVID-19 vaccine. (Pl. Decl. 7-45; Ex 1, Fire Commissioner's Application, p. 1-2 (FDNY Chief Medical Officer and Three Physician Medical Board diagnosed Plaintiff with an allergic reaction to the COVID vaccine and confirmed in their report that Plaintiff had suffered an allergic reaction to the

first vaccine dose, and that the allergic reaction worsened after the second dose); Ex. 7, Subchapter 2 Medical Board Recommendation, p. 2 ("A note from Dutchess Medical Associates, written 1/6/2022, indicated the member had an allergic reaction to COVID injections on 10/29/2021 and 11/22/2021."); Ex. 3, New York Presbyterian After Visit Summary; Ex. 6, BHS Examination Reports, p. 3 ("developed swollen lips, sweats, chills, and body aches after receiving COVID vaccine on 10/29"); Ex. 6, BHS Examination Report, p. 31).

56. The Centers for Disease Control and Prevention ("CDC") delineated the following contraindications to vaccination with COVID-19 vaccines: a severe allergic reaction after a previous dose, or an immediate allergic reaction of any severity to a previous dose. (Ex. 5, CDC Contraindications, p. 2).

57. The CDC also stated in its Clinical Considerations Before Use of COVID-19 Vaccines that the administration of antihistamines to COVID-19 vaccine recipients before receiving a COVID-19 vaccine was not recommended and could mask symptoms of anaphylaxis leading to a delay in diagnosis and management of anaphylaxis. (Ex. 5, CDC Contraindications, p. 2).

58. Despite CDC guidance identifying severe allergic reaction as a contraindication to further vaccination and recommending against recipients taking antihistamines, FDNY refused to acknowledge this or consider weekly testing as a safe alternative. (Pl. Decl. ¶¶ 37, 49; Ex. 6, BHS Examination Report, p. 31 ("given Benadryl and prescription for oral steroid and epi-pen)).

59. The FDNY never offered Plaintiff any potential accommodations in lieu of receiving the second dose of COVID-19 vaccine. (Pl. Decl. ¶49).

**Plaintiff's Continued Allergic Reaction to the Second Dose of COVID-19 Vaccine**

60. On November 23, 2021, Plaintiff received the second dose of the COVID-19

vaccine. (Pl. Decl. ¶50).

61.     He never returned to the fire house again. (Pl. Decl. ¶43; Ex. 2, BHS MD-9 Summary, p. 4).

62.     He thought that if he died while getting the second dose, at least the FDNY would provide for his wife and children. (Pl. Decl. ¶50).

63.     Plaintiff's allergic reaction to the COVID-19 vaccine "worsened" after he received the second dose. (Ex 1, Fire Commissioner's Application; Pl. Decl. ¶52).

64.     Plaintiff developed persistent shortness of breath, chest pain, decreased oxygen levels, and a worsening of the swelling (which was travelling from head and face to my extremities) and hives. (Pl. Decl. ¶52).

65.     On November 30, 2021, Plaintiff was again rushed to the Emergency Room with severe facial swelling and hives due to his allergic reaction to the COVID-19 vaccine. (Pl. Decl. ¶53).

66.     Plaintiff was again diagnosed with an allergic reaction, and given dexamethasone, more prednisone, as well as Famotidine. (Pl. Decl. ¶53).

67.     Plaintiff's symptoms after the second dose included severe chest pain, shortness of breath, and fatigue. (Pl. Decl. ¶53-54).

68.     Plaintiff thought he was going to die after he received the second dose of COVID-19 vaccine. (Pl. Decl. ¶54).

**Plaintiff's Continued Medical Issues and FDNY's Disability Determination**

69.     BHS has a Medical Committee (the "BHS Committee"). (Ex. 16, State Court Verified Answer, ¶59).

10

70. The BHS Committee, composed of physicians from BHS and chaired by the FDNY's chief medical officer, examines a firefighter for purposes of fitness for duty, i.e., whether the firefighter is fit for full firefighting duty, or if the firefighter is unable to perform full firefighting duty, whether he or she is able to perform a light duty assignment, or must be placed on medical leave. *Id.* at ¶60.

71. When the examination results in a finding that the firefighter is unfit for full firefighting duty, the Fire Commissioner may file an application for the member's retirement with the FPF. Alternatively, the member may also file an application on his or her own behalf. *Id.* at ¶60.

72. The Fire Commissioner applies for the member by endorsing the BHS Committee's report finding that the firefighter is unfit for full firefighting duty with an order to the Fire Department to process the application "on orders of Fire Commissioner." *Id.* at ¶60.

73. On February 28, 2023, the BHS Committee (Dr. Acuna, Dr. Cheny, and Dr. Ly) examined Plaintiff and reviewed his medical documentation, diagnosing him with myocarditis, and detailing his allergic reaction to the COVID-19 vaccine, starting from the first dose on October 29, 2021. (Ex. 6, BHS Examination Reports, p. 3-4).

74. The results of the BHS Committee were documented in a letter with the subject "RESULT OF MEDICAL COMMITTEE", from Dr. Karen Hurwitz, the Chief Medical Officer of FDNY. Ex. 1, Fire Commissioner's Application, p. 2.

75. The BHS Committee and Chief Medical Officer diagnosed Plaintiff with "allergic reaction to COVID vaccine" and "Myocarditis". Ex. 1, Fire Commissioner's Application, p. 2.

76. The BHS Committee and Chief Medical Officer's diagnostic opinion was that Plaintiff "is unfit for firefighting duties", and that Plaintiff "is at an increased risk for sudden incapacitation" "[g]iven the findings on the MRI, the history of the COVID, the history of the

allergic reaction to the vaccine, and the persistent findings of shortness of breath, chest pain, fatigue, and fibrosis on cardiac MRI". (Ex. 1, Fire Commissioner's Application, p. 2).

77. On March 10, 2023, Plaintiff was evaluated by FDNY BHS Dr. Anna Nolan. The "M.D.s Report" states: "given the persistent DOE/CP [dyspnea on exertion/chest pain] and the diagnosis of myocarditis with persistent fibrosis evidence of MRI, he can be incapacitated suddenly thus is unfit permanently to RTFD [return to full duty]." (Ex. 6, BHS Examination Reports, p. 1-2).

78. The report also noted "vaccine side effect with associated myocarditis," and the diagnosis was "COVID19 VACCINE SIDE EFFECT" which was designated as service connected ("SC"). (Ex. 6, BHS Examination Reports, p. 1-2).

79. The COVID-19 vaccines can cause cardiac conditions, including inflammation of the heart and myocarditis, recognized by the CDC. (Ex. 16, State Court Verified Answer, ¶67, n. 4).

80. On March 10, 2023, the FDNY Fire Commissioner, Laura Kavanaugh, endorsed the BHS Committee's February 28, 2023 Letter reporting the results of the BHS Committee, with an order to the FDNY to process the application "on orders of Fire Commissioner". (Ex. 1, Fire Commissioner's Application).

81. On or about March 13, 2023, the FPF Board of Trustees received an application from FDNY Fire Commissioner Laura Kavanaugh, requesting Plaintiff be considered for disability retirement. (Ex. 16, State Court Verified Answer, ¶64; Ex. 1, Fire Commissioner's Application).

82. On May 2, 2023, the Subchapter 2 Medical Board of the New York City Fire Pension Fund considered the FDNY Fire Commissioner's application pertaining to Plaintiff's

diagnoses of allergic reaction to COVID vaccine, myocarditis, and COVID disease. (Ex. 16, State Court Verified Answer, ¶65; Ex. 7, Subchapter 2 Medical Board Recommendations, p. 1).

83. The Medical Board reviewed the Fire Commissioner's Application, as well as Petitioner's relevant medical records. (Ex. 16, State Court Verified Answer, ¶66; Ex. 7, Subchapter 2 Medical Board Recommendations, p. 1).

84. The Medical Board, in recommending Ordinary Disability Retirement, unanimously agreed Petitioner was permanently disabled and issued the following determination: "Based upon our review of all medical records and interview with the member, it is the unanimous opinion of the Subchapter 2 Medical Board that FF Pastrana is permanently disabled as a consequence of myocarditis with ongoing symptoms, status post COVID vaccinations which precludes him from firefighting duties. Therefore, we recommend that he be granted an Ordinary Disability retirement for his Fire Commissioner's application for myocarditis with ongoing symptoms". (Ex. 16, State Court Verified Answer, ¶67; Ex. 7, Subchapter 2 Medical Board Recommendations, p. 4).

85. On June 28, 2023, the Fire Pension Fund Board of Trustees considered Plaintiff's case and reviewed his entire medical file, including the Medical Board's recommendations for Ordinary Disability Retirement. (Ex. 16, State Court Verified Answer, ¶83).

86. At the meeting, one of the board members made a motion to increase Plaintiff's retirement from Ordinary Disability to Accidental Disability. (Ex. 8, Fire Pension Fund Board Meeting Minutes, 119:12-16; Pl. Decl. ¶73).

87. There was a split vote, which resulted in a *Schoeck* decision, with the Pension Fund awarding Ordinary Disability (as opposed to Accidental Disability). (Ex. 18, Fire Pension Fund Determination; Pl. Decl. ¶74).

88.     When a Fire Pension Fund member is awarded Accidental Disability Retirement benefits, they receive, among other things, a pension amounting to "three-quarters of his or her annual earnable compensation on the date of retirement [.]" (Ex. 16, State Court Verified Answer, ¶63).

89.     Plaintiff brought an Article 78 proceeding to challenge the Fire Pension Fund's failure to upgrade to Accidental Disability Retirement. The New York State Supreme Court in New York County held that Plaintiff was permanently disabled by the COVID-19 vaccine, which was incidental and arose out of the performance of Plaintiff's routine employment duties, receiving the COVID-19 vaccine in compliance with the Vaccine Mandate. (Ex. 19, State Court Decision & Order, p. 3-4).

90.     Plaintiff's Ordinary Disability Retirement benefits provide barely enough to get by. (Pl. Decl. ¶86).

**Plaintiff's Mental Health Consequences and Ongoing Medical Treatment**

91.     To this day, Plaintiff physically suffers from permanent cardiovascular disability, chronic fatigue, trouble breathing, chest pain, loss of energy, shortness of breath, and small fiber neuropathy. (Pl. Decl. ¶¶ 65, 76-77; Ex. 7, Subchapter 2 Medical Board Recommendation, p. 3-4; *see* Ex. 6, BHS Examination Reports, p. 9, 3, 1).

92.     Plaintiff must be on medication for the long-term for heart failure, pain, and to keep hives at bay. (Pl. Decl. ¶¶ 80-82; Ex. 7, Subchapter 2 Medical Board Recommendation, p. 3-4).

93.     Plaintiff also has to carry around an inhaler (Albuterol) and an EpiPen. (Pl. Decl. ¶ 83; Ex. 7, Subchapter 2 Medical Board Recommendation, p. 4).

94. Personally, his family life is also suffering. (Pl. Decl. ¶¶ 66-67). He cannot play catch with his young daughter anymore. (Pl. Decl. ¶¶ 66-67). He cannot help his wife around the house. (Pl. Decl. ¶¶ 65-66).

95. He continues to struggle with immense loss over his career as a firefighter, his health, longevity of life, being physically able-bodied, and never having complete heart function again. (Pl. Decl. ¶¶ 65, 68; Ex. 6, BHS Examination Reports, p.9).

96. Plaintiff regularly receives ongoing mental health treatment from a FDNY therapist. (Pl. Decl. ¶¶ 64, 84). He has been diagnosed with ongoing posttraumatic stress disorder, and adjustment disorder with depressed mood. (Pl. Decl. ¶ 64; Ex. 6, BHS Examination Reports, p. 5-6).

97. Plaintiff deals with frustration, intrusive thoughts, sadness, anger, grief, self-doubt, guilt, loss, regret, feels invisible, and is completely devastated by what has happened to him. (Pl. Decl. ¶¶ 68).

98. Plaintiff brought an Article 78 proceeding against the New York City Fire Pension Fund, challenging the denial of Accidental Disability Retirement benefits. (Ex, 19, State Court Decision & Order).

99. The Supreme Court in New York County denied the petition, on the basis that Plaintiff's vaccine injury was incidental – not accidental – and that it arose out of his performance of routine duties, receiving the COVID-19 vaccine, not as a result of an unexpected event, as required to meet the definition of accident under the New York City Administrative Code. (Ex, 19, State Court Decision & Order).

**Plaintiff Could Have Performed the Essential Functions of His Job With a Reasonable Accommodation of Weekly Testing**

100. The New York City Department of Citywide Administrative Services ("DCAS")

published a document entitled "FAQ on New York City Employees Vaccine Mandate". (Ex. 10, FAQs).

101. City Workers were granted medical and religious accommodations to the Vaccine Mandate. (Ex 10, FAQs at ¶ 23; Ex. 12, FDNY Tracking Spreadsheet).

102. Weekly testing was a feasible accommodation. (Ex 10, FAQs at ¶¶ 24, 30, 32).

103. Any FDNY employee who was granted a reasonable accommodation to the Vaccine mandate was granted the accommodation of weekly testing and masking. (Ex. 11, Nguyen Dep. 176:5-24).

104. The FDNY solely considered weekly PCR testing together with masking as the only potential accommodation to the Vaccine Mandate. (Ex. 11, Nguyen Dep. 64:8-22; 169:4-13).

105. As of January 31, 2023, the FDNY partially or fully granted approximately 105 reasonable accommodations to the Vaccine Mandate. (Ex. 9, Nguyen Aff. ¶40; Ex. 11, Nguyen Dep 122:21-123:3).

106. The FDNY did not consider the number of firefighters who were requesting an accommodation in a firehouse when considering reasonable accommodations to the Vaccine Mandate. (Ex. 11, Nguyen Dep. 220:20-221:5).

107. The FDNY was able to accommodate full-duty firefighters who engaged in close contact with the public and other FDNY employees, including those who lived, slept, and ate in shared spaces within the firehouse. (Ex. 11, Nguyen Dep. 181:5-17; Banome Decl. ¶¶18-35; Fitzgerald Decl. ¶¶5-14; Whalen Aff. ¶¶19-34).

108. The FDNY granted both religious and medical accommodations – weekly PCR testing – to employees who had high levels of contact with the public and their colleagues, and whose duties include fighting fires, performing First Responder Emergency Medical Services, and

16

sleeping in the firehouse. (Ex. 11, Nguyen Dep. 181:5-17; Banome Decl. ¶¶18-35; Fitzgerald Decl. ¶¶5-14; Whalen Aff. ¶¶19-34).

109. The FDNY granted religious accommodations to the Vaccine Mandate to six FDNY firefighters. (Ex. 12, FDNY tracking accommodation spreadsheet; Ex. 13, Vasquez, Def. Resps. to Pl.'s First Set of Interrogs, No. 5; *see* Ex. 11, Nguyen Dep. ¶ 159:12-14).

110. The FDNY also granted religious accommodations to the Vaccine Mandate to many others, including: Supervisor of Mechanics, Supervisor of Carpenters, Accountant, Supervisor of Mechanics (Equip), four Communications Electricians, two Fire Battalion Chiefs, Supervisor of Electricians, two Clerical Associates, Supervisor of Mechanics, two Fire Lieutenants, two Plumbers, Associate Project Manager, Community Associate, four EMTs, two Fire Captains, Computer Specialist, Senior Stationary Engineer, Project Manager, Carpenter, 2 Associate Electrical Inspector, PAA, Candidate UA CID. (Ex. 12, FDNY tracking spreadsheet).

111. Thirty FDNY firefighters were granted medical accommodations to the Vaccine Mandate. (Ex. 14, Vasquez, Def. Supplemental Resps. to Pl.'s First Set of Interrogs, No. 7; Ex. 12, FDNY tracking spreadsheet).

112. The FDNY granted medical accommodations to: Firefighters, Fire Battalion Chief, EMTs, Auto Service Workers, Candidate UA-OMA, Lieutenants, Fire Alarm Dispatcher, Supervisor Fire Alarm Dispatcher. (Ex. 12, FDNY tracking spreadsheet).

113. Three FDNY firefighters were granted religious accommodations by the Citywide Panel. (Ex. 14, Vasquez, Def. Supplemental Resps. to Pl.'s First Set of Interrogs, No. 6).

114. Those FDNY employees who were able to submit proof of laboratory allergy test results confirming they were allergic to the COVID-19 vaccine were granted medical accommodations. (Banome Decl. ¶¶12, 14; Fitzgerald Decl. ¶4; Whalen Aff. ¶¶7-8, 15).

115.    1,176 FDNY employees who submitted a request for a reasonable accommodation were permitted to continue working while their accommodation request was pending, provided they submitted to weekly COVID-19 testing. (Ex. 9, Nguyen Aff. ¶¶10, 13). 937 of the 1,176 employees requested accommodations for religious reasons, and 229 requested accommodations for medical reasons. *Id*.

116.    Defendants never offered to allow Plaintiff to weekly test in lieu of vaccination. (Pl. Decl. ¶49).

Dated:  Staten Island, NY
          June 2, 2025

_____

Christina Martinez, Esq.
Law Offices of Christina M. Martinez
245 Bricktown Way, Suite J
Staten Island NY 10309
347-215-4543
*Attorney for the Plaintiff*