Docket No. 1:24-cv-07348 (BMC)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

O'BRIAN PASTRANA,

                              Plaintiff,

             v.


NEW YORK CITY FIRE DEPARTMENT,
NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE,
AND CITY OF NEW YORK,

                              Defendants.


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Christina Martinez, Esq.
*Attorney for Plaintiff*
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

**Sujata S. Gibson,**
Gibson Law Firm, PLLC
120 Buffalo Street, Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS .................................................................................................1

STANDARD OF REVIEW ................................................................................................8

ARGUMENT .....................................................................................................................9

    I.      Plaintiff stated a viable substantive due process claim.................................9

        A.  Plaintiff asserts violations of fundamental rights requiring strict scrutiny analysis 9

            1.  Plaintiff has a fundamental right to a medical exemption from government mandates that threaten his life...........................................................10

            2.  Strict scrutiny applies to medical exemption claims..........................12

        B.  Plaintiff's substantive due process claims should be strictly scrutinized but are viable under any standard of review ..........................................................12

            1.  Strict scrutiny applies and Defendants cannot meet their burden under strict scrutiny.............................................................................................12

            2.  *Jacobson* does not impose a lower standard of review...................13

            3.  Plaintiff's claims survive even under the *Jacobson* test ..................14

            4.  Under rational basis review, Plaintiff should also still prevail ......16

        C.  The unconstitutional conditions doctrine prohibits coercive     conditions ..........17

        D.  Pastrana's injuries are relevant to his constitutional claim and damages .............18

    II.     The undisputed record confirms Defendants failed to accommodate Plaintiff's disability.................................................................................................18

CONCLUSION.................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agudath Israel of Am. v. Cuomo,*
    983 F.3d 620, 635 (2d Cir. 2020)........................................................................13

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 247–48 (1986)...........................................................................12

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ..........................................................................................19

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432, 440 (1985)....................................................................................2

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988)............................................................................................2

*Cruzan v. Director, Missouri Dept. of Health,*
    497 U.S. 261, 269 (1990)......................................................................12, 14, 21

*Field Day, LLC v. Cnty. Of Suffolk,*
    463 F.3d 167 (2d Cir. 2006)................................................................................2

*Health Freedom Def. Fund v. Carvalho,*
    104 F.4th 715, 727 (9th Cir. 2024) ...................................................................13

*Immediato v. Rye Neck Sch. Dist.,*
    73 F.3d 454, 460 (2d Cir. 1996) .......................................................................27

*Jacobsen v. NYC Health & Hosps. Corp.,*
    22 N.Y.3d 824 (2014) .........................................................................................2

*Jacobson v. Commonwealth of Massachusetts,*
    197 U.S. 11 (1905)..............................................................................................6

*Jeffery v. City of New York,*
    113 F.4th 176, 188 (2d Cir. 2024) ......................................................................2

*Koontz v. St. Johns River Water Mgmt Dist.,*
    570 U.S. 595 (2013)..........................................................................................27

*Leebaert v. Harrington,*
    332 F.3d 134, 140 (2d Cir. 2003) .....................................................................27

*Maniscalco v. New York City Dep't of Educ.*,
  563 F. Supp. 3d 33, 38–40 (E.D.N.Y. 2021) ....................................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 586-87 (1986) ............................................................12, 24

*McBride v. BIC Consumer Products Mfg. Co., Inc.*,
  583 F.3d 92, 97 (2d Cir. 2009).............................................................2

*Pabon v. Wright*,
  459 F.3d 241, 251 (2d Cir. 2006)..........................................................27

*Perry v. Sinderman*,
  408 U.S. 593 (1972).........................................................................27

*Phillips v. City of New York*,
  66 A.D.3d 170, 176 (1st Dep't 2009) ....................................................27

*Rochin v. California*,
  342 U.S. 165, 172 (1952) ...................................................................13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S.Ct 63 (2020) .........................................................................13

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1, 17 (1973)...................................................................12, 13

*Sell v. United States*,
  539 U.S. 166 (2003) .......................................................................27

*Spinelli v. City of New York*,
  579 F.3d 160, 166 (2d Cir. 2009)...........................................................22

*Stenberg v. Carhart*,
  530 U.S. 914, 937 (2000)...............................................................21, 23

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707, 718 (1981)...............................................................12, 13

*Turney v. Safley*,
  482 U.S. 78 (1987)..........................................................................13

*Washington v. Glucksberg*,
  521 U.S. 702, 721 (1997)...........................................................12, 14, 21

*Washington v. Harper,*
    494 U.S. 210 (1990) ...................................................................................................13

*Williamson v. Lee Optical of Oklahoma, Inc.,*
    348 U.S. 483 (1955) ..................................................................................................27

**Statutes**

Federal Rule of Civil Procedure 26(a)(2)(D)(i) ............................................................... 14

Federal Rule of Civil Procedure 56(a) ............................................................................. 9

N.Y.C. Admin. Code §8-107(1)(a); 15(a)-(b)................................................................ 18

N.Y.C. Admin. Code §8-107(28)(a) ............................................................................... 24

New York City Human Rights Law................................................................... 18, 24, 25

New York State Human Rights Law ...................................................................... 18, 25

N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(j)(5) (2025)....................................... 21

N.Y. Executive Law §296(3)(a) ..................................................................................... 18

N.Y. Penal Law 35.15(2)(a)(b) ....................................................................................... 10

U.S. Constitution, Amendment XIV .............................................................................. 12

**Other Authorities**

Ashworth, A.J., Self-Defense and the Right to Life, 34 Cambridge L.J. 282 (1975)................... 10

Gostin, Lawrence O., Public Health Law: Power, Duty, Restraint (2d ed. 2008) ...................... 15

Locke, John, Second Treatise of Government (1690) ............................................... 10

## PRELIMINARY STATEMENT

This case presents a stark constitutional violation transcending mere statutory claims. Despite undeniable documentation of Pastrana's life-threatening anaphylactic reaction to the first COVID-19 vaccine dose, the City enforced its mandate with inexplicable rigidity, refusing accommodation him even though he was contraindicated under CDC guidelines. Facing termination, Pastrana was coerced into choosing between his career and health—a choice violating his fundamental right to refuse contraindicated medical treatment. The consequences were devastating: myocarditis, chronic disability, and career termination.

Defendants rigid official policy was clearly communicated – they would not even consider a medical exemption unless Pastrana could produce an allergy test (even though he could not take an allergy test due to treatment for his severe anaphylactic reaction). Defendants now seek summary judgment by distorting the record and shifting blame onto Plaintiff for complying with their own directives. But the law does not reward employers who refuse to engage in the interactive process, then fault employees for acting under duress. As the Court of Appeals made clear in *Jacobsen v. NYC H+H*, 22 N.Y.3d 824 (2014), anti-discrimination statutes are meant to prevent exactly this scenario: forcing workers to choose between their health and their job. Summary judgment must be denied. The undisputed facts establish not only the absence of a good faith effort to accommodate, but also a reckless disregard for Plaintiff's constitutional rights and basic safety.

## STATEMENT OF FACTS

Plaintiff's Local Civil Rule 56.1 Statement of Material Facts in Support of Plaintiff's Cross-Motion for Partial Summary Judgment, dated June 2, 2025, ECF No. 22-1 (hereafter "Pl. SOMF"), along with the Declaration of Plaintiff dated May 31, 2025, ECF No. 22-3 ("Pl. Decl."), Affidavit of Kevin Whalan, dated February 14, 2025, ECF No. 22-6 (Whalan Aff.), Declaration of Robert Banome, dated June 2, 2025, ECF No. 22-5 (Banome Decl.), and Declaration of Stephen

1

Fitzgerald, dated June 2, 2025, ECF No. 22-7 (Fitzgerald Decl.), sets forth the relevant factual allegations and are incorporated herein by reference. Key facts are repeated here as follows:

On October 20, 2021, the New York City Commissioner of Health and Mental Hygiene issued the City Worker COVID-19 Vaccine Mandate ("Vaccine Mandate"), requiring City employees, including the Plaintiff, to take two doses of COVID-19 vaccination.[1] Defendants granted firefighters similarly situated to Plaintiff both religious and medical accommodations and allowed them to continue working unvaccinated while submitting to weekly PCR testing.[2]

COVID-19 vaccines are unusual in that they do not prevent infection or transmission of the COVID-19 virus but were known at the time of the Mandate to only provide personal protection from severe disease.[3] On July 27, 2021—months before the Mandate was implemented—the Centers for Disease Control and Prevention ("CDC") issued guidance stating that "[v]accinated people can still become infected and spread the virus to others."[4] CDC Director Rochelle Walensky admitted that the COVID vaccines "can't do anymore is prevent transmission."[5] On July 30, 2021, Director Walensky issued a public statement acknowledging that "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people," indicating that "vaccinated people infected with Delta can transmit the virus."[6]

Plaintiff, Obrian Pastrana, a dedicated New York City firefighter, rolled up his sleeve and

---

[1] Pl. SOMF ¶3-5 (citing ECF No. 22-22, Pl. Ex. 15, Vaccine Mandate)
[2] Pl. SOMF ¶¶105 (citing ECF No. 22-16, Pl. Ex. 9, Nguyen Aff. ¶40; ECF No. 22-18, Pl. Ex. 11, Nguyen Dep 122:21-123:3); SOMF ¶¶107-113 (citing ECF No. 22-18, Pl. Ex. 11, Nguyen Dep. 181:5-17; ECF No. 22-5, Banome Decl. ¶¶18-35; ECF No. 22-7, Fitzgerald Decl. ¶¶5-14; ECF No. 22-6, Whalen Aff. ¶¶19-34; Ex. 12, FDNY tracking accommodation spreadsheet; ECF No. 22-20, Pl. Ex. 13, Vasquez, Def. Resps. to Pl.'s First Set of Interrogs, No. 5; ECF No. 22-18, Pl. Ex. 11, Nguyen Dep. ¶ 159:12-14; ECF No. 22-19, Pl. Ex. 12, FDNY tracking spreadsheet; ECF No. 22-21, Pl. Ex. 14, Vasquez, Def. Supplemental Resps. to Pl.'s First Set of Interrogs, No. 6-7)
[3] Plaintiff's Additional Material Facts Pursuant to Local Civil Rule 56.1(b), Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, filed pursuant to Local Civil Rule 56.1(b)) at ¶ 1 (hereafter "Pl. 56.1(b) Counterstmt.")
[4] Pl. 56.1(b) Counterstmt. ¶2.
[5] Pl. 56.1(b) Counterstmt. ¶3.
[6] Pl. 56.1(b) Counterstmt. ¶4.

2

received the COVID-19 vaccine by the City's October 29, 2021 deadline—not out of choice, but out of duty, determined to keep his job and support his family.[7] He immediately developed chills, sweats, body aches, arm soreness, hives, and swelling in his lips.[8] The following day, he contacted the FDNY Bureau of Health Services ("BHS") to report that he needed medical leave due to an adverse reaction.[9]  FDNY placed him on medical leave from October 30 to November 2, 2021, and required him to report to BHS for evaluation.[10]  BHS has a medical clinic that is staffed with medical officers who make determinations about FDNY firefighters placed on medical leave.[11]

On November 1, 2021, Mr. Pastrana was examined by FDNY physician Dr. Barbara Cheung, who formally diagnosed him with a "COVID-19 vaccine side effect" and classified it as "service-connected".[12] He reported chills, sweats, body aches, injection-site pain, lip swelling, and hives on his head.[13] He explained that he had been taking over-the-counter medications, but they were ineffective.[14] Critically, Mr. Pastrana expressed his fear about getting a second dose and explicitly asked not to receive it, explaining that his body was reacting severely.[15] Dr. Cheung told him that he was required to be fully vaccinated in order to remain employed and did not offer a medical exemption.[16]

Over the next two weeks, Plaintiff's symptoms worsened.[17] On November 15, 2021,

---

[7] Pl. SOMF ¶7-8 (citing ECF No. 22-3, Pastrana Decl. ¶5-7; see Ex. 1, Fire Commissioner's Application, p. 1; Ex, 16, State Court Verified Answer, ¶8)).

[8] Pl. SOMF ¶9 (citing ECF No. 22-3, Pastrana Decl. ¶8; Ex. 1, Fire Commissioner's Application, p. 1; Ex. 6, BHS Examination Reports, p. 3)

[9] Pl. SOMF ¶10 (citing ECF No. 22-3, Pastrana Decl. ¶9)

[10] Pl. SOMF ¶¶12–13 (citing ECF No. 22-3, Pastrana Decl. ¶10-11; ECF No. 22-9, Pl. Ex. 2, BHS MD-9 Summary, p. 4)

[11] Pl. SOMF ¶ 11 (citing ECF No. 22-23, Pl. Ex. 16, State Court Verified Answer ¶59)

[12] Pl. SOMF ¶14 (citing ECF No. 22-3, Pastrana Decl. ¶12; ECF No. 22-9, Pl. Ex. 2, p. 4).

[13] Pl. SOMF ¶15 (citing ECF No. 22-3, Pastrana Decl. ¶13; ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, p. 1)

[14] Pl. SOMF ¶16 (citing ECF No. 22-3, Pastrana Decl. ¶14)

[15] Pl. SOMF ¶17 (citing ECF No. 22-3, Pastrana Decl. ¶¶15–16)

[16] Pl. SOMF ¶18 (citing ECF No. 22-3, Pastrana Decl. ¶17)

[17] Pl. SOMF ¶¶19–21 (citing ECF No. 22-3, Pastrana Decl. ¶¶19–21)

several hours into his shift, his supervisor noticed that his face was swelling rapidly.[18] The swelling spread down the left side of his body—including his torso, leg, and foot—alarming his supervisor so much that he called an ambulance.[19] Pastrana received emergency intravenous treatment from FDNY staff in the ambulance and was transported to the hospital, where he was prescribed epinephrine and additional steroids and diagnosed with a severe allergic reaction.[20] The next day, November 16, 2021, Pastrana was required to return to BHS for what is known as a "field visit," the FDNY's protocol for in-the-line-of-duty injuries considered medically serious.[21] There, he was evaluated by FDNY physician Dr. N. Chandswang, who observed that Plaintiff's lips remained swollen despite hospital treatment the day before and ongoing prednisone use.[22]

Pastrana explained his adverse reaction in detail and explained that despite taking Benadryl, Zyrtec, Claritin and prednisone, his severe anaphylactic reaction persisted.[23] Pastrana pleaded with Dr. Chandswang for a medical exemption; He said he could not tolerate a second dose in his condition.[24] Dr. Chandswang responded that the only way to obtain a medical exemption was to undergo allergy testing to confirm an allergy to a component of the vaccine—something that Plaintiff's own symptoms already confirmed.[25] Pastrana was terrified, knowing that the second dose could trigger an even more catastrophic reaction—but he was told he had no choice regardless of his severe medical condition. [26] Dr. Chandswang told him explicitly that no employee could forgo the second dose without laboratory test results proving a vaccine allergy.[27]

---

[18] Pl. SOMF ¶24 (citing ECF No. 22-3, Pastrana Decl. ¶24)

[19] Pl. SOMF ¶¶25–26 (citing ECF No. 22-3, Pastrana Decl. ¶¶25–26)

[20] Pl. SOMF ¶¶27–29 (citing ECF No. 22-3, Pastrana Decl. ¶¶27–29; ECF No. 22-10, Pl. Ex. 3, NYP After Visit Summary, Nov. 15, 2021)

[21] Pl. SOMF ¶30 (citing ECF No. 22-3, Pastrana Decl. ¶30)

[22] Pl. SOMF ¶32 (citing ECF No. 22-3, Pastrana Decl. ¶31; ECF No. 22-13, Pl. Ex. 6, BHS Exam Report, p. 31).

[23] Pl. SOMF ¶¶33–39 (citing ECF No. 22-3, Pastrana Decl. ¶¶32–35; ECF No. 22-13, Pl. Ex. 6 p.31)

[24] Pl. SOMF ¶40 (citing ECF No. 22-3, Pastrana Decl. ¶36)

[25] Pl. SOMF ¶41 (citing ECF No. 22-3, Pastrana Decl. ¶37; ECF No. 22-13, Pl. Ex. 6, p. 31).

[26] Pl. SOMF ¶43 (citing ECF No. 22-3, Pastrana Decl. ¶38)

[27] Pl. SOMF ¶44 (citing ECF No. 22-3, Pastrana Decl. ¶39; ECF No. 22-13, Pl. Ex. 6, p. 31)

Pastrana was placed back on medical leave from November 15 through November 22, 2021.[28] But even on prednisone, his symptoms persisted, and he continued to suffer from hives, swelling of the face, lips, and nose, and shortness of breath.[29] On November 21, 2021, he was again rushed to the emergency room due to the severity and worsening of his allergic reaction, including worse shortness of breath, swelling, and hives, and he was diagnosed with anaphylaxis.[30] He was prescribed another 30-day course of prednisone in an effort to stabilize his condition.[31] On November 22, 2021, Pastrana met with allergist Dr. Jinlin Du, who informed him the allergy test could not be performed while he was on prednisone, which interferes with its accuracy and safety.[32] After that appointment, it became undeniably clear to Pastrana that he could not safely obtain the required allergy testing and therefore could not qualify for a medical exemption.[33]

As noted by the Fire Pension Fund Board itself, firefighters are trained to "follow orders", and in this case, the order was absolute: get the second dose or lose your job.[34] The Board recognized, "The firefighter has no other choice. He either has a job or he has to take the vaccine." *Id*. With no accommodation offered and no way to meet the City's laboratory testing requirement, Pastrana had no choice but to proceed with the second dose to avoid termination.[35]

The employer's rigid policy was not a miscommunication or isolated act—it was the City's position, stated plainly in its motion to dismiss, that laboratory allergy test results were "necessary"

[28] Pl. SOMF ¶45 (citing ECF No. 22-3, Pastrana Decl. ¶42; ECF No. 22-9, Pl. Ex. 2, p. 4)
[29] Pl. SOMF ¶46 (citing ECF No. 22-3, Pastrana Decl. ¶44)
[30] Pl. SOMF ¶47-48 (citing ECF No. 22-3, Pastrana Decl. ¶45; ECF No. 22-11, Pl. Ex. 4, Garnet Health After Visit Summary; ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's App)
[31] Pl. SOMF ¶48 (citing ECF No. 22-3, Pastrana Decl. ¶45; ECF No. 22-11, Pl.Ex. 4, Garnet Health Medical Center After Visit Summary)
[32] Pl. SOMF ¶49-50 (citing ECF No. 22-3, Pastrana Decl. ¶46)
[33] Pl. SOMF ¶51 (citing ECF No. 22-3, Pastrana Decl. ¶¶47–49)
[34] Pl. SOMF ¶52 (citing ECF No. 22-15, Pl. Ex. 8, Pension Fund Meeting Minutes, p. 102:5–20)
[35] Pl. SOMF ¶53 (citing ECF No. 22-3, Pastrana Decl. ¶¶47–49)

to obtain a medical exemption.[36] But FDNY was well aware that Pastrana had suffered a severe allergic reaction to the first dose, documented repeatedly by FDNY physicians, BHS records, and medical documentation.[37] Under CDC guidance, a severe allergic reaction following a prior dose of the COVID-19 vaccine is a contraindication to receiving additional doses.[38] The CDC also explicitly advised against taking a COVID-19 vaccination while a person is suffering a "moderate or severe acute illness, with or without fever" or while on antihistamines like prednisone, as they could mask symptoms of anaphylaxis and delay necessary treatment.[39] Despite this, the FDNY required Plaintiff to get a second dose while he was still experiencing an ongoing severe reaction to the first dose and actively taking antihistamines and steroids.[40]

The FDNY never offered Plaintiff any alternative to submitting an allergy test—not even weekly testing, which had been granted to other similarly situated employees as a medical or religious accommodation.[41] On November 23, 2021, Plaintiff received the second dose of the COVID-19 vaccine in order to avoid termination and continue providing for his family.[42] He was severely injured and has never returned to the firehouse.[43] Pastrana's allergic reaction "worsened" after the second dose, with new and persistent symptoms including severe chest pain, shortness of breath, reduced oxygen levels, and spreading swelling and hives from his face to his extremities.[44] On November 30, 2021, Pastrana was again rushed to the emergency room with facial swelling

---

[36] Pl. SOMF ¶54 (citing ECF Doc. No. 12-1, Def. Mot. to Dismiss at 17–19; ECF No. 22-3, Pastrana Decl. ¶¶37, 39; ECF No. 22-6, Whalen Aff. ¶¶13–15 (FDNY Chief Medical Officer admitting to policy requiring a confirmed lab allergy test to vaccine components for exemption); ECF No. 22-5, Banome Decl. ¶¶12, 14 (allergy test results required); ECF No. 22-7, Fitzgerald Decl. ¶4 (same)).
[37] Pl. SOMF ¶55 (citing ECF No. 22-3, Pastrana Decl. ¶¶7–45; ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, pp. 1–2; ECF No. 22-10, Pl. Ex. 3, NYP After Visit Summary; ECF No. 22-13, Pl. Ex. 6, BHS Reports; ECF No. 22-14, Pl. Ex. 7, Subchapter 2 Medical Board Rec., p. 2)
[38] Pl. SOMF ¶56 (citing ECF No. 22-12, Pl. Ex. 5, CDC Clinical Considerations, p. 2).
[39] Pl. SOMF ¶57 (citing ECF No. 22-12, Pl. Ex. 5, p. 2)
[40] Pl. SOMF ¶58 (citing ECF No. 22-3, Pastrana Decl. ¶¶37, 49; ECF No. 22-13, Pl Ex. 6, BHS Exam Report, p. 31).
[41] Pl. SOMF ¶59 (citing ECF No. 22-3, Pastrana Decl. ¶49)
[42] Pl. SOMF ¶60 (citing ECF No. 22-3, Pastrana Decl. ¶50)
[43] Pl. SOMF ¶61 (citing ECF No. 22-3, Pastrana Decl. ¶43; ECF No. 22-9, Pl. Ex. 2, BHS MD-9 Summary, p. 4)
[44] Pl. SOMF ¶¶63–64 (citing ECF No. 22-3, Pastrana Decl. ¶52; ECF No 22-8, Pl. Ex. 1, Fire Commissioner's App).

and hives.[45] He thought he was going to die.[46] On February 28, 2023, the BHS Committee, consisting of three FDNY physicians, examined Plaintiff and reviewed his medical records. They diagnosed him with myocarditis and allergic reaction to the COVID-19 vaccine.[47] Their opinion, endorsed by Chief Medical Officer Dr. Karen Hurwitz, concluded that Plaintiff was "unfit for firefighting duties" and at "increased risk for sudden incapacitation" based on MRI findings, documented allergic reaction to the COVID vaccine, and persistent symptoms including fatigue, chest pain, and shortness of breath.[48] BHS Dr. Anna Nolan reaffirmed the diagnosis of myocarditis, stating that Plaintiff "can be incapacitated suddenly thus is unfit permanently to RTFD [return to full duty]".[49] The report stated "vaccine side effect with associated myocarditis", and his diagnosis was again recorded as "COVID19 VACCINE SIDE EFFECT," marked as service-connected.[50] As the City admitted, the CDC recognizes that COVID-19 vaccines may cause myocarditis and other cardiac conditions.[51]

Pastrana mistakenly believed that so long as he followed orders and took the second dose, if he died, or was seriously injured, at least his family would be financially protected by the FDNY.[52] But FDNY would not even allow him that. On March 10, 2023, FDNY Fire Commissioner Laura Kavanagh formally endorsed the Committee's findings and filed an application for Plaintiff's disability retirement "on orders of Fire Commissioner".[53] The application was received by the Fire Pension Fund (FPF) Board of Trustees on or about March 13,

---

[45] Pl. SOMF ¶¶65–66 (citing ECF No. 22-3, Pastrana Decl. ¶53)
[46] Pl. SOMF ¶68 (citing ECF No. 22-3, Pastrana Decl. ¶54)
[47] Pl. SOMF ¶¶73–75 (citing ECF No. 22-13, Pl. Ex. 6, BHS Examination Reports, pp. 3–4; ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, p. 2).
[48] Pl. SOMF ¶76 (citing ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, p. 2)
[49] Pl. SOMF ¶77 (citing ECF No. 22-13, Pl. Ex. 6, BHS Examination Reports, pp. 1–2)
[50] Pl. SOMF ¶78 (citing ECF No. 22-13, Pl.Ex. 6, BHS Examination Reports, pp. 1–2).
[51] Pl. SOMF ¶79 (citing ECF No. 22-23, Pl. Ex. 16, State Court Verified Answer ¶67 n.4).
[52] Pl. SOMF ¶62 (citing ECF No. 22-3, Pastrana Decl. ¶50).
[53] Pl. SOMF ¶80 (citing ECF No. 22-8, Ex. 1, Fire Commissioner's Application)

2023.[54] On May 2, 2023, the Subchapter 2 Medical Board of the FPF reviewed Plaintiff's complete medical record and unanimously found him "permanently disabled as a consequence of myocarditis with ongoing symptoms, status post COVID vaccinations which precludes him from firefighting duties", yet, on June 28, 2023, the FPF Board of Trustees voted to grant Pastrana only Ordinary Disability Retirement, determining that his injury, while service connected, was not an "accident" such as would qualify for heightened disability benefits.[55]

To this day, Plaintiff, a young man in his 30s, suffers from chronic shortness of breath, cardiac disability, fatigue, chest pain, and small fiber neuropathy.[56] He requires long-term medications for heart failure, pain, and inflammation, and he carries both an inhaler and an EpiPen daily.[57] His physical limitations have taken a toll on his family life—he can no longer play catch with his daughter or help around the house.[58] He has lost his career, his health, and his physical capabilities, and lives with the knowledge that he will never again regain full heart function.[59] Pastrana continues to receive mental health care and was diagnosed with PTSD and adjustment disorder with depressed mood.[60] He lives with intrusive thoughts, grief, anger, guilt, and the devastation of knowing that the vaccine he was forced to take even though it was contraindicated for him cost him his health, career, and quality of life.[61]

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when

---

[54] Pl. SOMF ¶81 (citing ECF No. 22-23, Ex. 16, State Court Verified Answer ¶64)
[55] Pl. SOMF ¶¶82–85 (citing ECF No. 22-23, Pl. Ex. 16, State Court Verified Answer ¶¶65–67, 83; ECF No. 22-14, Pl. Ex. 7, Subchapter 2 Medical Board Recommendations, pp. 1–4)
[56] Pl. SOMF ¶91 (citing ECF No 22-3, Pastrana Decl. ¶¶65, 76–77; ECF No. 22-13, Pl. Ex. 6, BHS Examination Reports, pp. 9, 3, 1; ECF No. 22-14, Pl. Ex. 7, Subchapter 2 Medical Board Recommendations, pp. 3–4)
[57] Pl. SOMF ¶¶92–93 (citing ECF No 22-3, Pastrana Decl. ¶¶80–83; ECF No. 22-14, Pl. Ex. 7, Subchapter 2 Medical Board Recommendations, pp. 3–4)
[58] Pl. SOMF ¶94 (citing ECF No. 22-3, Pastrana Decl. ¶¶65–67)
[59] Pl. SOMF ¶95 (citing ECF No. 22-3, Pastrana Decl. ¶¶65, 68; ECF No. 22-13, Pl. Ex. 6, BHS Examination Reports, p. 9)
[60] Pl. SOMF ¶96 (citing ECF No. 22-3, Pastrana Decl. ¶64; ECF No. 22-13, Pl. Ex. 6, BHS Examination Reports, pp. 5–6)
[61] Pl. SOMF ¶97 (citing ECF No. 22-3, Pastrana Decl. ¶68)

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *Id.* If this burden is met, the non-moving party must then present specific evidence, beyond mere allegations or denials, to show a triable issue exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted))

## ARGUMENT
### POINT I: PLAINTIFF STATED A VIABLE SUBSTANTIVE DUE PROCESS CLAIM

**A. Plaintiff asserts violations of fundamental rights requiring strict scrutiny analysis.**

Defendants argue that Plaintiff's substantive due process claim fails, even under the generous summary judgment standard, because the Vaccine Mandate does not implicate any fundamental rights and does not shock the conscience. [Def. Br. at 5]. This mischaracterizes both the nature of Plaintiff's claim and the applicable constitutional standard. Plaintiff does not challenge the facial validity of the Vaccine Mandate but rather challenges the City's narrow medical accommodation policy and its application to him—a firefighter who suffered a documented severe allergic reaction to the first dose of the COVID-19 vaccine, including anaphylaxis, a known contraindication for subsequent doses per CDC guidelines. He asserts that the City's policy of denying medical accommodations unless an employee showed laboratory proof of allergy to a component of the vaccine was unconstitutional as applied to him, because it was

too narrow to accommodate his fundamental rights to protect himself from likely harm not to mention his fundamental right refuse medicine generally.

1. **Plaintiff has a fundamental right to medical exemption from government mandates that threaten his life**

Plaintiff has a fundamental right to a medical exemption from a government mandate that places him at risk of harm. At its core, the right to a medical exemption when a person is at risk of serious harm derives from the natural right to self-preservation—a right deeply rooted in our nation's history and traditions. See, e.g., A.J. Ashworth, SELF-DEFENCE AND THE RIGHT TO LIFE, 34 Cambridge L.J. 282 (1975). Foundational political philosophers recognized this natural right. William Blackstone described the right to protect one's "life and limb" from harm as "the primary law of nature," holding that it is an "absolute right" which "every man has a right to enjoy." 1 W. BLACKSTONE COMMENTARITES. John Locke similarly described self-preservation as being so fundamental that "no law can oblige a man to abandon it." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT (1690). This right forms the basis for exceptions to nearly all laws, even criminal laws against homicide, assault, and weapon possession. See, e.g., N.Y. PENAL LAW 35.15(2)(a)-(b); MODEL PENAL CODE 3.04 cmt. 4(a).

If exemptions from murder laws are permitted based on the right to self-preservation, a firefighter cannot be denied accommodation from a second vaccine dose after nearly dying from the first, especially when CDC guidance indicates contraindication and the vaccine cannot stop transmission. Indeed, even in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court recognized the right to a medical exemption as constitutionally protected. Holding that state police power "must always yield in case of conflict with...any right which [the Constitution] gives or secures" (Id. at 25) the *Jacobson* Court gave just one example of such a situation – that is, the denial of a medical exemption to a person at risk of harm. The Court differentiated between Mr.

Jacobson's generalized liberty interest and an as-applied claim of someone who offered "to prove that by reason of his then-condition, he was in fact not a fit subject of vaccination." Id. at 36-37. Since Mr. Jacobson declined to claim that he was at heightened risk of harm from vaccines, instead opining that they were generally unsafe, the Court found no constitutional violation.

Defendants rely on *Jacobson* for the general holding that vaccine mandates are constitutional. But the Court's holding assumed the statute allowed medical exemptions for adults "if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health or probably cause his death." Id. at 38-39. The Court emphasized that judicial intervention is required when medical exemptions are denied:

> Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely— that the police power of a state…may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression…It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned.

Id. at 38–39.

Plaintiff's condition falls squarely within this protected category triggering judicial scrutiny. Pastrana suffered life-threatening anaphylactic response requiring emergency intervention, epinephrine administration, and repeated hospitalization. It was "apparent" and could be "shown with reasonable medical certainty" that he was not fit for the second dose. The CDC explicitly recognizes "severe allergic reaction after a previous dose" as a contraindication. FDNY's refusal to accommodate Pastrana despite knowledge of his clear need is precisely the type of scenario the Court described as deserving of judicial scrutiny.

**2. Strict scrutiny applies to medical exemption claims.**

11

Supreme Court precedent has evolved significantly since 1905. Since *Jacobson,* the Supreme Court has consistently applied strict scrutiny to medical exemption claims, clarifying that if a medical exemption policy is narrow enough that it might exclude even a few who might need it, it is unconstitutional on its face. *See, e.g., Stenberg v. Carhart,* 530 U.S. 914, 937 (2000); *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320 (2006).[62] The Court now also expressly recognizes a fundamental right to refuse medical intervention, even lifesaving medical intervention. This right was first explicitly recognized in *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990), wherein the Court recognized a due process liberty interest in refusing unwanted medical treatment based on the doctrine of informed consent and the common-law rule that forced medication equals battery. In recognizing this right, the Supreme Court noted, "no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." *Id*. at 269.

**B. Plaintiff's substantive due process claims should be strictly scrutinized but are viable under any standard of review.**

**1. Strict scrutiny applies and Defendants cannot meet their burden under strict scrutiny.**

It is well-established that the Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (recognizing the right to refuse medical intervention as fundamental). Defendants' medical exemption policy does not meet this burden. There is no compelling interest in forcing an

---

[62] Most medical exemption cases post-*Jacobson* have arisen in the abortion context but the Court's framework for addressing them shows they are not tied to the now overruled right to an abortion. In all the Court's medical exemption cases, the Court assessed whether otherwise *lawful* abortion regulations (i.e., late term abortions, parental notification statutes, etc) had adequate safeguards to ensure that the right to an adequate medical exemption was not infringed. Likewise, even where a vaccine mandate is itself lawful, the Court's jurisprudence on medical exemptions should require strict scrutiny where a medical exemption is withheld so long as the plaintiff can assert a prima facie case that they are likely at risk of harm due to their underlying condition.

employee to take a medically contraindicated vaccine, especially where the vaccine cannot stop transmission and is only for personal benefit. Moreover, many less restrictive alternatives existed, such as providing medical accommodation to Pastrana based on his documented severe anaphylactic reaction instead of rigidly requiring him to submit a lab test that he was unable to take due to his condition. The facts show that over a thousand firefighters were accommodated, and Defendants cannot show as a matter of law that they could not have afforded the same accommodation to Pastrana.

**2. *Jacobson* does not allow for a lower standard of review.**

Defendants cite *Jacobson* to suggest strict scrutiny should not apply, but this approach was expressly abrogated. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct 63 (2020)). In Agudath Israel, the Second Circuit held that "[r]eliance on Jacobson was misplaced…Jacobson predated the modern constitutional jurisprudence of tiers of scrutiny…Indeed, the Jacobson Court itself specifically noted that 'even if based on the acknowledged police powers of a state,' a public-health measure 'must always yield in case of conflict with ... any right which [the Constitution] gives or secures.'" 983 F.3d at 635.

Moreover, the Ninth Circuit's recent decision in *Health Freedom Def. Fund v. Carvalho*, 104 F.4th 715, 727 (9th Cir. 2024) recognized that *Jacobson* does not apply to "vaccines" that primarily benefit the recipient like COVID-19 vaccines. *Jacobson's* deferential standard was predicated on preventing transmission and protecting the public. However, "*Jacobson* did not involve a claim in which the compelled vaccine was 'designed to reduce symptoms in the infected vaccine recipient rather than to prevent transmission and infection.'" Id. When intervention is not for the "common" good, the state's police powers do not govern.

13

As in *Carvalho*, there is a material dispute about whether COVID-19 vaccines meaningfully stop transmission or are therapeutic, which must be resolved in Plaintiff's favor at this stage. The Amended Complaint alleges the government admitted vaccines did not stop transmission prior to the Mandate's imposition. [FAC ¶¶ 48-62]. Defendants argue Plaintiff lacks expert witness support, but expert disclosures are not required until 90 days before trial. Fed. R. Civ. P. 26(a)(2)(D)(i). No trial date is set nor is there an order imposing an earlier deadline.

The record contains ample evidence, including sworn statements from experts like NIH Director Dr. Jay Bhattacharya [ECF No. 21-7] and Yale professor Dr. Harvey K. Risch [ECF No. 21-14], establishing that COVID-19 vaccines do not stop transmission and are for personal protection. [See also ECF Nos. 21-4, 5, 9-13]. Defendants offer no counter-evidence. Their only argument—that declarations call COVID-19 vaccines "vaccines"—misses the point. *Jacobson* invoked police powers based on stopping disease spread, not the label "vaccine." If "vaccines" includes therapeutics that don't stop community spread, those products cannot trigger police powers or any *Jacobson* exception. When a vaccine primarily benefits the recipient rather than preventing transmission, strict scrutiny applies to infringement of a person's right to refuse it.

### 3. Plaintiff's claims survive even under the *Jacobson* test.

Moreover, Plaintiff's claims are still viable under the *Jacobson* test. This is, essentially, the same test applied in prison settings, where, for similar reasons articulated in *Jacobson*, the Court holds that fundamental rights infringement may be reviewed under a lesser burden. *Turney v. Safley*, 482 U.S. 78 (1987). In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court articulated a four-part test that must be applied today in the assessment of a prison's infringement on the right to refuse medicine, holding that such infringement on liberty can occur only if four elements are proven: (1) "important governmental interests are at stake," to be evaluated based on

14

the "facts of the individual case"; (2) "the involuntary medication will significantly further" those interests; (3) "the involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate, i.e., in the patient's best interest in light of his medical condition." 539 U.S. at 180-181. The ultimate test is: "Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Id*. at 183.

Under the *Sell* test, Pastrana has clearly articulated a claim. Defendants offer no reasonable explanation for the denial, only a rigid, arbitrary requirement unrelated to public health. Forcing Pastrana to take the contraindicated second dose failed all prongs: the vaccine could not further public health interests because it could not stop transmission; allowing his exemption would not significantly hamper any effort; it was unnecessary given that 1,176 firefighters worked unvaccinated without any approved medical or religious accommodation; and most importantly, administration was not in Pastrana's best interest, as CDC guidance explicitly contraindicated further doses due to his anaphylaxis.

Alternatively, Plaintiff offers and easily passes the test set forth in *Jacobson* itself. Public health scholars recognize five constitutional prerequisites articulated in *Jacobson*: (1) public health necessity; (2) reasonable means; (3) proportionality; (4) harm avoidance, and (5) fairness. *See, e.g.,* LAWRENCE O. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28 (2d ed. 2008). Defendants' medical exemption policy, at least as applied to Pastrana, cannot meet these prerequisites. It is patently unfair and violates principles of harm avoidance to require an employee to choose between his job and a vaccine which is contraindicated for him due to his underlying condition and injury from the first dose. Nor is it proportional or necessary to ask him

15

to play Russian Roulette with his life, given the multiple carve outs and official recognition that the vaccine is only for personal protection.

4. **Under rational basis review, Plaintiff should also still prevail**.

Indeed, Defendants' reasoning for denying accommodation to Pastrana is so arbitrary, reckless and cruel that it shocks the conscience and represents the rare case that easily should pass even rational basis review. The Catch-22 situation—where Plaintiff could not obtain the required proof because he was being treated for the severe reaction—demonstrates the arbitrary nature of Defendants' policy. Equally shocking, Defendants argue that Plaintiff's severe allergic reaction and anaphylaxis were merely "temporary conditions" not deserving protection or accommodation. This reveals the callous and inhuman nature of their approach: they created a system where life-threatening reactions to the first dose were deemed insufficient grounds for accommodation from the second dose. This position ignores that a "temporary" anaphylactic reaction can permanently end a person's life if they are forced to receive a second dose, as recognized by CDC guidelines. Under such policies, tragedies like the one Pastrana suffered were not just a possibility, they were an inevitability.

Defendants' own arguments illustrate why Pastrana's constitutional claims are viable: when statutory protections prove inadequate, as Defendants argued in their motion to dismiss here, constitutional protections must fill the gap to prevent government actions that "shock the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952). This case is such a case. Pastrana was a team player, and all he asked for was a reasonable medical accommodation in accordance with the CDC's guidance. Instead, without any rational basis, the City forced him to submit to a second dose, even though it was highly likely he would be severely injured and killed, and now he is disabled for life and unable to provide for or care for his family. This shocks the conscience and is like the example given by this Court in *Maniscalco,* 563 F. Supp at 38-40. In that case, this Court

opined that requiring employees to take ivermectin, a medical intervention that the CDC did not recommend in the context of Covid-19 would likely fail rational basis review and shock the conscience. *Id.* Likewise here, the CDC's guidance provided that Covid-19 vaccines were contraindicated for people like Pastrana who had suffered a severe reaction to the first dose, and the City's insistence that he take it anyway does not advance a rational basis.

### C. The unconstitutional conditions doctrine prohibits coercive conditions

To the extent that Defendants argue they merely conditioned employment on compliance, this argument fails. "Even though a person has no 'right' to a valuable government benefit... [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972). The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt Dist.*, 570 U.S. 595, 604 (2013).

The Hobson's choice imposed on Pastrana also violates *Jacobson's* proportionality requirement. In the concurring opinion in *Roman Catholic Diocese of Brooklyn,* Justice Gorsuch pointed out that *Jacobson's* continued viability hinges on the fact that the penalty for noncompliance was not overly coercive, and thus might pass muster under modern tiers of scrutiny, stating: "In *Jacobson*, individuals could accept the vaccine, pay the fine [$5], or identify a basis for [medical] exemption. 141 S.Ct. 63, 71 (2020) (Gorsuch J., concurring). The imposition on Mr. Jacobson's claimed right to bodily integrity, thus, was avoidable and relatively modest. It easily survived rational basis review and might even have survived strict scrutiny, given the [medical exemption] opt-outs available." *Id.*  This point was embraced by the entire Court. "Tellingly, no Justice disputes these points." *Id.* Here, no such proportionality exists. The City

17

inflexibly demanded that Pastrana take a contraindicated vaccine that would likely kill or seriously harm him or lose his entire career. Certainly, this is more coercive than a $5 fine, even adjusted for inflation, and it has none of the saving opt-outs recognized by the Supreme Court as vital to such an analysis.

### D.  Pastrana's injuries are relevant to his constitutional claim and damages

While Pastrana's injuries are not required to prove his constitutional claims, they demonstrate the arbitrary and conscience-shocking nature of Defendants' conduct. The very harm CDC guidance sought to prevent—severe disability from contraindicated vaccination—occurred precisely as medical evidence predicted. A young firefighter supporting his family now suffers permanent heart failure and disability. This outcome confirms both that Pastrana was medically unfit for vaccination under *Jacobson* and that Defendants' inflexible policy, applied despite clear contraindications, shocks the conscience. The damages also defeat any mootness claim.

### POINT II: THE UNDISPUTED RECORD CONFIRMS DEFENDANTS FAILED TO ACCOMMODATE PLAINTIFF'S DISABILITY

To establish a *prima facie* claim for failure to accommodate under the NYSHRL and NYCHRL, a plaintiff must make the following showing: (1) plaintiff is a person with a disability; (2) the employer had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009); *see* Executive Law § 296(3)(a); N.Y.C. Admin. Code § 8–107(1)(a); 15(a)-(b).

Defendants move for summary judgment solely on the fourth prong – asserting (with no record support) that Plaintiff "had neither been approved nor denied." ECF Doc. No. 21-2, Def. Mem. of Law, p. 16 of 21. That claim is flatly contradicted by the record. As a matter of fact, there

is not one statement in Defendants' Rule 56.1 Statement asserting that Defendants were considering Pastrana's request or engaging in a cooperative dialogue. *See* ECF Doc. No. 21-1.

Pastrana notified FDNY of his need for accommodation on November 1, 2021 and the FDNY BHS physician told him that he must receive the second dose of the COVID-19 vaccine or he would be terminated.[63] This is uncontested. Then on November 16, 2021, Pastrana notified FDNY BHS that he was experiencing an ongoing allergic reaction to the COVID-19 vaccine, could not safely receive the second dose, and required a medical exemption.[64] In response, FDNY BHS Dr. Chandswang told him that the *only way* to qualify for a medical exemption was to obtain documentation from an allergist confirming an allergy to the vaccine.[65] Without that test, he was told, he would be required to become fully vaccinated or face the consequences:

> I told him plainly: this was a reaction to the vaccine, and I could not get the second dose; I needed a medical exemption. In response, **Dr. Chandswang informed me that the only way to qualify for a medical exemption was to undergo an allergy test that confirmed an allergy to the vaccine. He told me that, without that test, I would be required to be fully vaccinated in order to continue working**—even though I was still on prednisone for an active allergic reaction. I was terrified. I knew that if I got the second dose, my reaction could become even more dangerous, but I was told I had no choice. **I was told by Dr. Chandswang that the FDNY wouldn't be letting anyone off the hook without being fully vaccinated and providing proof of that second dose without that allergy test**.

ECF No. 22-3, Pastrana Decl. ¶¶ 36–39; *see* Pl. SOMF ¶¶40-44.

Defendants do not contest this. At no point—either in their Rule 56.1 Statement or in their exhibits—do Defendants point to a single document, email, or testimony indicating that Plaintiff was invited to engage in dialogue, offered an alternative, or told that the allergy test was optional. Defendants' memorandum of law asserts that "the cooperative dialogue had not concluded and

---

[63] Pl. SOMF ¶¶14-18 (citing ECF No. 22-3, Pastrana Decl. ¶¶12-18; ECF Doc. No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, p. 1; ECF Doc. No. 22-9, Pl. Ex. 2, BHS MD-9 Summary, p. 4; Pl. Decl. ¶12).

[64] Pl. SOMF ¶¶31-40 (citing ECF No. 22-3, Pastrana Decl. ¶¶31-36; ECF No. 22-13, Pl. Ex. 6, BHS Examination Report, p. 31).

[65] Pl. SOMF ¶¶41-44 (citing ECF No. 22-3, Pastran Decl. ¶¶37-39; ECF No. 22-13, Pl. Ex. 6, BHS Examination Report, p. 31 ("f/u allergy test"); ECF Doc. No. 22-6, Whalan Aff. ¶¶13-15).

that no final determination had been reached by the FDNY with respect to Plaintiff's request". ECF Doc. No. 21-2, Def. Mem. of Law, p. 15 of 21. But this is pure attorney argument unsupported by the record. There is absolutely no evidence that the FDNY was actively considering Plaintiff's request or engaging in any cooperative dialogue. And Defendant's own Rule 56.1 Statement shows that they were not. Defendants admit that medical exemption requests were reviewed and decided by the FDNY EEO Office together with FDNY BHS[66], yet Defendants admit that the EEO Office never reviewed Pastrana's accommodation request[67]. Moreover, there is no genuine dispute as to the material fact that the FDNY informed Pastrana that the *sole means* of obtaining a medical accommodation was to produce allergy test results confirming an allergy to the COVID-19 vaccine.[68] Defendants do not claim that Pastrana was told differently.

With regard to paragraph 13 of Defendants' Statement of Material Facts – which states: "Dr. Chandswang's BHS examination notes dated November 16, 2021, state that Dr. Chandswang "counseled"[69] Plaintiff to "f/u allergy test" – that entry is not evidence of a different version of events; it is corroboration of Plaintiff's account. This is not a case of disputed facts. There is only one version of events in the record, and it is fully supported by Plaintiff's sworn declaration, the declarations of other firefighters who were granted medical exemptions, and FDNY medical records, including Defendants' own cited exhibit.[70] Defendants do not offer any evidence, testimony, or records suggesting that any other path to accommodation was available to Pastrana

---

[66] ECF No. 21-1, Def. 56.1 Stmt. ¶¶8-9
[67] ECF No. 21-1, Def. 56.1 Stmt. ¶7
[68] Pl. SOMF ¶¶40-44 (citing ECF No. 22-3, Pastrana Decl. ¶¶ 36–39; ECF Doc. No. 22-13, Pl. Ex. 6, BHS Examination Report, p. 31 ("f/u allergy test"); ECF Doc. No. 22-6, Whalan Aff. ¶¶13-15)
[69] To the extent Defendants' emphasis on the word "counseled" is intended to imply that Dr. Chandswang merely made a suggestion, that interpretation is both unsupported by any evidence in the record and at odds with the plain meaning of the term. Merriam-Webster defines the verb "counsel" as "to advise," and that is precisely what Dr. Chandswang did—he advised Plaintiff that an allergy test was required in order to obtain a medical exemption.
[70] Pl. SOMF ¶54 (citing ECF Doc. No. 12-1, Def. Mem. of Law in Support of Def. Motion to Dismiss, p. 17-19 (describing such test results as "necessary"; ECF No. 22-3, Pastrana Decl. ¶¶37; 39; *see* ECF No. 22-6, Whalan Aff. ¶¶13-15; ECF No. 22-5, Banome Decl. ¶¶12, 14; ECF No. 22-7, Fitzgerald Decl. ¶4).

or discussed with him. Indeed, they do not deny that Pastrana was required to submit an allergy test. Dr. Chandswang's notation does not put any fact in dispute; rather, it demonstrates a single, consistent record. Defendants' only cited evidence confirms Plaintiff's account.

The evidence is unrefuted: FDNY made an allergy test a condition precedent to any accommodation for Pastrana—despite that requirement being unnecessary to verify an allergic reaction that was already well-documented and well-known to the FDNY.[71] This blanket demand violates § 466.11(j)(5), which limits an employer's right to demand documentation to what is strictly "necessary to verify" the existence of that disability or to evaluate the proposed accommodation. As EEOC[72] guidance similarly clarifies, an employer may not ask an employee for documentation "when the **disability or the need for the accommodation is known or obvious**". EEOC Enforcement Guidance on Disability-Related Inquiries, Q&A 7 (emphasis in original), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#N_50_. Here, both the disability and the need for accommodation were unmistakably known, yet the FDNY insisted on unnecessary testing as the sole gateway to accommodation, denying Plaintiff any reasonable accommodation at all.

---

[71] Pl. SOMF ¶¶ 24-29 (citing ECF No. 22-3, Pastrana Decl. ¶¶24-29; ECF No. 22-10, Pl. Ex. 3, New York Presbyterian After Visit Summary, November 15, 2021); SOMF ¶¶ 30-40 (citing ECF No. 22-3, Pastrana Decl. ¶¶30-36; ECF No. 22-13, Pl. Ex. 6, BHS Examination Report, p. 31); SOMF ¶¶ 12-17 (citing ECF No. 22-3, Pastrana Decl. ¶¶10-16; ECF No. 22-9, Pl. Ex 2, BHS MD-9 Summary, p. 4; ECF No. 22-8, Pl. Ex. 1, Fire Commissioner's Application, p. 1); *see also* Pl. SOMF ¶55 (citing ECF No. 22-3, Pastrana Decl. 7-45; ECF No. 22-8, Pl. Ex 1, Fire Commissioner's Application, p. 1-2 (FDNY Chief Medical Officer and Three Physician Medical Board diagnosed Plaintiff with an allergic reaction to the COVID vaccine and confirmed in their report that Plaintiff had suffered an allergic reaction to the first vaccine dose, and that the allergic reaction worsened after the second dose); ECF No. 22-14, Pl. Ex. 7, Subchapter 2 Medical Board Recommendation, p. 2 ("A note from Dutchess Medical Associates, written 1/6/2022, indicated the member had an allergic reaction to COVID injections on 10/29/2021 and 11/22/2021."); ECF No. 22-10, Pl. Ex. 3, New York Presbyterian After Visit Summary; ECF No. 22-13, Ex. 6, BHS Examination Reports, p. 3 ("developed swollen lips, sweats, chills, and body aches after receiving COVID vaccine on 10/29") and p. 31).

[72] "The Second Circuit has interpreted the amended NYCHRL as establishing a ' "one-way ratchet," by which interpretations of state and federal statutes can serve only "as a *floor* below which the City's Human Rights law cannot fall." ' " *Limauro v. Consol. Edison Co. of New York, Inc.*, 2021 WL 466952, at *4 (S.D.N.Y. Feb. 9, 2021) (quoting *Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013); Local Civil Rights Restoration Act of 2005, §1.

21

Defendants' attempt to shift blame onto Plaintiff for receiving the second dose mischaracterizes the events and ignores the circumstances he faced. Plaintiff did not disregard an ongoing dialogue—he was told, unequivocally, that no medical accommodation would be considered unless he first obtained an allergy test. When his physician informed him that such testing was medically contraindicated, he reasonably concluded—based on the FDNY's own representations—that no accommodation was available to him.[73] At this point, there was no qualifying path to exemption. He was left with no choice but to comply with the mandate. As the Fire Pension Fund Board itself acknowledged regarding Pastrana:

> One of the conditions of employment to be a New York City firefighter is you have to follow orders. If you don't follow orders, then you are subjected to departmental charges. Well, in this case, this member followed the orders of his superiors, his superiors being actually officers, but more importantly, the Fire Department and the City of New York. They required him to take a vaccine, and if he didn't take the vaccine, the penalty was you're fired, so actually the firefighter has no other choice. He either has a job or he has to take the vaccine.

ECF No. 22-15, Pl. Ex. 8, Fire Pension Fund Board Meeting Minutes, p. 102:5-20.

Pastrana receiving the second dose was not a result of a breakdown in dialogue caused by Plaintiff, but a total failure on behalf of the FDNY to engage in one. Pastrana's subsequent decision to get vaccinated under the pressure of a looming mandate deadline and threat of termination was not voluntary—it was the consequence of the Defendants' refusal to meaningfully consider accommodation.

Defendants' unsubstantiated contention—that Plaintiff's failure to inform FDNY that the allergy test could not be completed is fatal to his claim—is both factually unsupported and legally immaterial. The record is clear: FDNY expressly told Plaintiff that the only way to obtain a medical exemption was to produce a positive allergy test. He was not invited to return for further dialogue,

---

[73] Pl. SOMF ¶¶51-53 (citing ECF No. 22-3, Pastrana Decl. ¶¶47-49; ECF No. 22-15, Pl. Ex. 8, Fire Pension Fund Board Meeting Minutes, p. 102:5-20).

nor told that other documentation might suffice. He was told, point blank, that without an allergy test, he would have to be vaccinated. That is not a suggestion. It is a directive. The suggestion that Plaintiff should have disregarded that directive—should have assumed that the medical professional overseeing the process was lying or mistaken, and that further dialogue was available despite the unambiguous ultimatum—is both illogical and unjust. Plaintiff relied on the FDNY's own representation that the allergy test was a precondition to accommodation. There is no evidence—none—that FDNY would have done anything differently had Plaintiff returned to report the test could not be performed. Defendants do not even allege that they would have offered an alternative accommodation. Nor could they, especially when such a position flatly contradicts their own prior representations to the Court[74]. Accordingly, the fact that Plaintiff did not return to repeat that the required test could not be done—is not *material*. No reasonable jury could conclude that this omission caused or contributed to the denial of accommodation. Rather, the failure lies with the FDNY, which refused to engage in any meaningful interactive process, imposed a legally baseless condition, and made clear that absent that single test, Plaintiff would be terminated. That is a textbook failure to accommodate.

Rather than making a fact-specific inquiry into Plaintiff's individual circumstances—as required by law—Defendants applied a categorical rule to Pastrana: no allergy test, no exemption. The FDNY was well aware that Pastrana had an immediate allergic reaction to the first dose[75], which steadily worsened, culminating in his removal by ambulance from the firehouse.[76] Pastrana was evaluated by FDNY's own medical personnel – who observed that Plaintiff's lips remained

---

[74] In their motion to dismiss, Defendants affirmatively argued that an allergy test was necessary to support a medical exemption. ECF Doc. No. 12-1, Def. Mem. of Law in Support of Def. Motion to Dismiss, p. 17-19 (describing such test results as "necessary").
[75] Pl. SOMF ¶55 (citing)
[76] Pl. SOMF ¶¶ 24-29 (citing ECF No. 22-3, Pastrana Decl. ¶¶24-29; ECF No. 22-10, Pl. Ex. 3, New York Presbyterian After Visit Summary, November 15, 2021

swollen despite hospital treatment the day before and ongoing prednisone use.[77] Nevertheless, Defendants refused to consider any accommodation absent documentation of the test results.

"[S]ummary judgment is not available where there is a genuine dispute as to whether the employer has engaged in a good faith interactive process." *Phillips v. City of New York*, 66 A.D.3d 170, 176 (1st Dep't 2009). There is no evidence that FDNY made any individualized assessment of Plaintiff's medical condition, risks, or limitations. No alternative accommodations were discussed. No temporary exemption was offered. And no dialogue occurred.

That failure alone violates the NYCHRL, which mandates that employers engage in a cooperative dialogue with any employee who either requests accommodation or who the employer has notice may require one. N.Y.C. Admin. Code § 8-107(28)(a). The dialogue must involve a good faith exploration of potential accommodations based on the individual's circumstances, not blanket policies or assumptions. "Rather than operating on generalizations about people with disabilities, employers (and courts) must make a clear, fact-specific inquiry about each individual's circumstance." *Phillips*, 66 A.D.3d at 175. Defendants' rigid policy—limiting accommodation only to individuals who could provide documentation of allergy test results—carved out a category of disabled individuals who were categorically excluded from any interactive or cooperative process. As the *Phillips* court held: "An employer simply cannot abrogate the requirements of the HRLs by carving out a category of employees who are not subject to an interactive process. Accordingly, defendants' policy ... is in direct violation of both statutes." *Phillips*, 66 A.D.3d at 177–78, 884 N.Y.S.2d at 375.

This case is no different. Defendants refused to consider any accommodation unless Plaintiff completed a medical procedure that was not only completely unnecessary but also

---

[77] Pl. SOMF ¶32; ECF No. 22-3, Patrana Decl. ¶31; ECF No. 22-13, Pl. Ex. 6, BHS Exam Report, p. 31.

contraindicated. This requirement precluded any accommodation for Pastrana, who could not undergo allergy testing—despite CDC guidance confirming that documented adverse reactions are sufficient medical grounds to avoid further vaccination.[78] By hiding behind a rigid protocol, Defendants avoided the interactive process altogether. That is precisely what the NYCHRL and NYSHRL forbid. The motion for summary judgment must therefore be denied.

As the Court of Appeals made clear in *Jacobsen v. NYC Health & Hosps. Corp.*, 22 N.Y.3d 824, 843–44 (N.Y. 2014), "an employer's failure to reasonably accommodate a worker's disability as soon as the employer learns of that condition is the very societal ill which the relevant anti-discrimination statutes were designed to combat." Here, Defendants were on actual notice of Plaintiff's allergic reaction and his request for a medical exemption as early as October 30, 2021, and were further aware that his reaction was ongoing and worsening over the weeks that followed. Yet by November 23 they had not only failed to offer any reasonable accommodation but explicitly told Pastrana that he would need to receive the second dose unless he procured an allergy test which was impossible for him to obtain given his underlying condition and treatment protocol. As in *Jacobsen*, the Court should not reward Defendants with summary judgment simply because Plaintiff, facing termination and denied any viable path to accommodation, felt compelled to follow orders and receive the vaccine despite the risk to his health. Pastrana was in the precise "pernicious quandary" the *Jacobsen* Court warned of: choosing between preserving his health or his livelihood.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment should be denied in its entirety.

Dated:  Ithaca, New York
           June 30, 2025                                    Respectfully submitted,

---

[78] Pl. SOMF ¶56 (citing ECF No. 22-12, Pl. Ex. 5, CDC Clinical Considerations, p. 2).

25

*/s/ Christina Martinez*
Law Offices of Christina Martinez
245 Bricktown Way, Suite J
Staten Island, NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

/s/ *Sujata S. Gibson*
Gibson Law Firm, PLLC
120 E. Buffalo St, Suite 2
Ithaca, New York 14850
T: (607) 327-3284
sujata@gibsonfirm.law

*Attorneys for Plaintiff*

26